Filed 4/17/26  P. v. Coronado CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICKIE SILGUERO CORONADO,<br><br>    Defendant and Appellant. | F087776<br><br>(Super. Ct. No. VCF085450-02)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Dina Petrushenko and Charlotte Woodfork, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant Rickie Silguero Coronado was committed to the custody of the State Department of State Hospitals (DSH) for an indeterminate term after a jury found he was a sexually violent predator under the Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.).[1]  On appeal, he argues the trial court (1) abused its discretion by admitting inadmissible and prejudicial evidence regarding his conduct while in DSH custody, (2) prejudicially erred in denying his motion for mistrial based on expert testimony that violated the court's ruling on a motion in limine, and (3) prejudicially erred in excluding evidence that he would be required to register as a sex offender if released.  He additionally argues he was prejudiced by the cumulative effect of these errors.

We reject Coronado's contentions and affirm.

**PROCEDURAL HISTORY**

"In 2004, Coronado was sentenced to 10 years in prison after pleading no contest to one count of sodomy by use of force (Pen. Code, § 286, subd. (c)), and two counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)).  In 2011, while Coronado was in custody, the Tulare County District Attorney filed a petition to commit Coronado as a sexually violent predator under the [Sexually Violent Predators Act].

"A jury trial on the petition commenced on November 16, 2015.  At trial, the People sought to prove Coronado's status as a [sexually violent predator] through the testimony of three of his victims, A.A., G.S., and M.C.[2]  The People also elicited expert testimony from [L.] Sidhu, Psy.D., and [E.] Simon, Ph.D.  Coronado elicited expert

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2] "To protect the victims' privacy, we refer to them by initials only.  No disrespect is intended."

testimony from [T.] Donaldson, Ph.D." (*People v. Coronado* (Nov. 13, 2018, F072867) [nonpub. opn.] [as modified Dec. 6, 2018] (*Coronado*).)

"On November 20, 2015, the jury returned a verdict finding Coronado qualified as a sexually violent predator as alleged in the petition.  That same day, the trial court ordered Coronado committed to the DSH for an indeterminate term." (*Coronado*, *supra*, F072867.)

On appeal, we held Coronado was prejudiced by the court's admission of inadmissible, case-specific hearsay introduced through Sidhu's testimony in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).  Accordingly, we reversed and remanded for further proceedings.  (*Coronado*, *supra*, F072867.)

On remand, the case was continued numerous times for a variety of reasons.  A retrial eventually commenced on June 27, 2023.  However, the jury was unable to reach a verdict and the trial court declared a mistrial on July 11, 2023.

A third trial commenced on February 29, 2024.  On March 12, 2024, the jury returned a verdict finding Coronado qualified as a sexually violent predator as alleged in the petition.  On the same date, the court ordered Coronado committed to DSH for an indeterminate term.

## FACTUAL BACKGROUND

The following evidence was presented at Coronado's most recent trial.

## I. Abuse of A.A.

At the time of trial, A.A. was 38 years old.  A.A. testified that Coronado is his maternal uncle.  Coronado sexually assaulted A.A. multiple times beginning when A.A. was five years old.  The incidents involved A.A. orally copulating Coronado, Coronado orally copulating A.A., Coronado sodomizing A.A., and A.A. sodomizing Coronado.[3]

---

[3] Coronado's offenses against A.A. are the qualifying offenses offered to support the People's petition for his commitment as a sexually violent predator.

A.A. told Coronado "no" multiple times, but Coronado did not stop and told A.A., "[Y]ou know you like this."

A.A. testified regarding several specific instances of abuse. In the earliest incident A.A. recalled, he was five years old and not yet in school when Coronado babysat him and took him to his grandmother's apartment. Coronado pulled down A.A.'s pants, put his penis "between [A.A.'s] butt and everything and rubb[ed] it," and put his penis in A.A.'s mouth.

When A.A. was nine or 10 years old, Coronado moved away and the abuse stopped. However, the abuse began again when Coronado moved back to the area to care for A.A.'s grandfather when A.A. was 13 or 14 years old. A.A.'s grandfather had Alzheimer's disease and was hard of hearing, and Coronado lived with him. A.A. would bring food over to the apartment nearly every day and Coronado would "attack" him by pushing him against the wall, pulling down his pants and telling A.A. to ejaculate him. This would occur while A.A.'s grandfather was in the living room, but he could not hear A.A.'s attempts to get his attention.

A.A. testified to an incident wherein he attempted to exit the apartment through a rear sliding glass door. Coronado was seated in a reclining chair near the door and pulled A.A. back.

A.A. recalled another incident that occurred when he was 13 or 14 years old, in which Coronado took him to a building and pushed him into a walk-in freezer or meat locker and orally copulated him. Coronado put A.A.'s hands down Coronado's pants to ejaculate him.

When A.A. was 15 years old, Coronado showed him a black and white journal containing names, dates, and numbers spanning multiple pages. Coronado told A.A., "[T]his is what I've been doing." A.A. understood that Coronado was trying to tell him he "wasn't the only one."

4.

A.A. recalled another incident that occurred when he was 15 or 16 years old. A "kid" who was in high school with A.A., but who was friends with Coronado, was with Coronado at A.A.'s grandfather's apartment. A.A. took food to the apartment and Coronado grabbed him and took him to his grandfather's bedroom. The friend held A.A.'s hands above his head and Coronado pulled down A.A.'s pants and orally copulated him. Coronado then forced A.A. to orally copulate Coronado until he ejaculated.

On one occasion, A.A. yelled to get his grandfather's attention, and Coronado "backhand[ed]" him and told him to "shut up." Most of the times that Coronado hit A.A., he would also try to kiss him, indicating to A.A. that Coronado was drinking. During most of the incidents of abuse, A.A. smelled alcohol and cigarettes on Coronado's breath.

The abuse escalated until A.A. could not stand it anymore. Coronado had a gun and threatened to hurt A.A.'s family if he said anything. When A.A. was 16 or 17 years old, he reported the abuse to his mother. That same night, A.A. and his mother reported the abuse to the police. A.A. estimated that, from the time he was 13 until he reported the abuse, the abuse happened about 15 times. He did not see Coronado abuse anyone else.

A.A. described himself as more "closed off" than his two brothers. He was bullied in elementary school and attended special education classes and had been diagnosed with schizoaffective disorder with bipolar disorder and depression.

## II. Abuse of G.S.

At the time of trial, G.S. was 40 years old. G.S. is Coronado's nephew and A.A.'s cousin. G.S. testified that he was in special education classes in high school, was a regional center client (see § 4620) at the time of trial, has a disability, and has difficulty remembering things. A.A. described G.S. as very shy and nervous.

Coronado began engaging in sexually inappropriate conduct with G.S. when G.S. was five years old, continuing until he was 18 years old. On one occasion when G.S. was

5.

five years old, Coronado unzipped and pulled down his pants and was getting ready for G.S. to orally copulate him when G.S.'s mother walked in.

G.S. recalled another incident that happened in the bathroom of a fast-food restaurant in Atascadero when G.S. was a teenager. Coronado took G.S. into a locked bathroom stall and wanted G.S. to orally copulate him. G.S. orally copulated Coronado for five to 10 minutes and Coronado told him to be quiet. Ultimately, G.S.'s father walked in and caught G.S. and Coronado in the bathroom together, but did not see the oral copulation.

When G.S. was 18 years old, Coronado picked him up and took him to a park. Coronado unzipped his own pants and pulled G.S.'s hand and made G.S. masturbate him until he ejaculated. G.S. told Coronado to stop, but Coronado kept going.

On at least one occasion, G.S. told Coronado to stop and he stopped.

G.S. would see Coronado about once a month, and Coronado would touch him inappropriately or act inappropriately every time. This involved Coronado orally copulating G.S., G.S. orally copulating Coronado, and G.S. masturbating Coronado.

## III. Abuse of M.S.

M.S. was 41 years old when he gave a videotaped deposition in relation to this case.[4] M.S. is Coronado's nephew and G.S.'s brother.[5] Coronado was around a lot when M.S. was growing up in Porterville. M.S. thought they had a good relationship growing up, and Coronado would take M.S. and his siblings to parks. As M.S. grew older, the relationship deteriorated, and M.S. did not like Coronado anymore because Coronado was a "pervert" and would molest M.S. and his brothers and cousin by trying to perform sexual acts on them or having them perform sexual acts on him.

---

[4] The deposition video was received into evidence and played for the jury.

[5] M.S. testified that Coronado is his mother's brother. He refused to identify him as his uncle, stating, "I don't claim him as my uncle."

6.

M.S. estimated that Coronado began to sexually abuse him beginning when M.S. was eight or nine years old. He would masturbate himself in front of M.S. and then start "feeling on" M.S. Coronado would ejaculate or have M.S. ejaculate him, and then try to see if M.S. could ejaculate. He also would orally copulate M.S. and tried to have M.S. orally copulate him. Coronado did this any time he had the chance. M.S. did not recall Coronado kissing him. Coronado also tried to sodomize M.S. Coronado would try to normalize his behavior. When the family would visit an aunt in Atascadero, Coronado would get drunk and make it seem like it was normal for M.S., his brothers, and his cousins, both male and female, to perform sexual acts on each other. All the siblings and cousins were close in age. M.S. described this behavior as a "kid orgy." Coronado also engaged in this behavior when he was sober.

The abuse ebbed as M.S. got older and became more aggressive about saying "no," and eventually stopped when M.S. was 13 or 14 years old. When M.S. was 14 years old, Coronado attempted to "feel on [him]," and M.S. told him "that was enough; if he ever tried to do that again, that [M.S.] would hurt him." Coronado never tried again after that.

M.S. described Coronado as someone who "will prey on the weak." M.S.'s father was not in the picture, and his mother had four boys by the time she was 21 years old and she took advantage of opportunities to be young and go out partying. As such, M.S.'s only male role models were his uncles, M.C. and Coronado, both of whom he described as "child molesters." M.S. described Coronado as someone who preyed on people who "don't have anybody there to . . . stand up for them." M.S. testified that he also was abused by M.C.

M.S. was intimidated by Coronado because he previously went to jail and prison, and Coronado would tell them not to tell anyone because "snitches would end up in ditches."

7.

M.S. acknowledged that, when he eventually spoke with police in 2002, he reported that he was not aware of Coronado molesting anyone other than himself. He explained that he did not want to bring anyone else into it and was trying to protect his other relatives who were victims of the abuse. M.S. also acknowledged that, for a time, he "lived a gang life" and did not want to be a snitch. He acknowledged that he had committed crimes and been to prison.

## IV. Abuse of M.C.

At the time of trial, M.C. was 55 years old. M.C. is Coronado's younger brother by five years. M.C. has three sisters and four other brothers. M.C. testified that Coronado molested him as a child. The abuse began when M.C. was about five or six years old and lasted until he was about 13 years old.

The first incident M.C. could recall occurred when he was living with his grandmother in Corcoran. M.C. recalled coming out of a small shack in the backyard, crying and naked. Coronado was present.

Coronado also molested M.C. when M.C. was elementary school aged and living in Tulare. When M.C. lived in Tulare, he shared a room with a younger brother. Sometimes, he would go to sleep in his own room and wake up in Coronado's bed with no clothes on to find Coronado orally copulating him or making M.C. "do him." This occurred a couple of times per month. Coronado "did everything" with M.C., including sodomizing M.C. and having M.C. sodomize him. Also in Tulare, Coronado would pick the lock on the bathroom door and enter the bathroom while M.C. was bathing.

In another incident, Coronado pinned M.C. to the ground and slapped his face, and M.C. could not go to school for a week because his face was red. Coronado would physically and sexually abuse M.C. when he was drinking.

The last incident occurred when M.C. was 13 years old and living in Porterville. M.C. was asleep on the couch and woke to find Coronado sitting next to him on the

ground with his hands in M.C.'s shorts. M.C. took Coronado's hand out and "told him that was it, no more."

M.C. did not tell anyone about the abuse as it was happening. One reason he did not report the abuse was because he was afraid of Coronado. Once he turned 13, he was a little bit bigger and stopped being scared.

At the time of trial, M.C. was serving a life sentence for child molestation. His offense was committed against a nonfamily member when M.C. was 20 or 21 years old.

## V.     Abuse of P.F.

### A.     Testimony of P.F.

At the time of trial, P.F. was 43 years old, lived in Atascadero, and was a regional center client.

P.F. testified that he spoke with police in 1998, when he was 17 years old, after being molested on Halloween while at a party at a park in San Luis Obispo for the United Cerebral Palsy organization. The party occurred during the day inside a park building. P.F.'s mother dropped him off at the party; however, P.F. grew bored and left the party at some point to sit on a park bench about 20 feet away. A stranger approached and introduced himself as "Rick Lucio." P.F. identified Coronado in court as the man who approached him. P.F. told Coronado he was 17. Coronado told P.F. that there was a hole inside the men's restroom to peek into the women's restroom; he also told P.F. about a nude beach and asked P.F. if he got a "hard-on." P.F. and Coronado talked for about 10 minutes.

At some point, Coronado asked P.F. to go into the bathroom to see the peephole Coronado mentioned and P.F. agreed. Coronado showed P.F. the peephole within a bathroom stall and told him how to get an erection. He told P.F. to take his pants down and started feeling inside P.F.'s shirt. Either P.F. or Coronado took P.F.'s pants down and Coronado started kissing P.F. on his mouth and chest. Coronado also put his finger

9.

in P.F.'s anus and orally copulated him. Coronado said that he ejaculated. At some point someone came into the bathroom, but the person did not see P.F. and P.F. did not say anything. P.F. and Coronado were in the bathroom for about 30 to 45 minutes. P.F. felt "grossed out" when Coronado put his finger in P.F's anus but was afraid to say so. P.F. stated he was shy at that time and afraid of standing up for himself.

When they left the bathroom, P.F. and Coronado sat together on the grass near the playground, where they remained until P.F.'s mother came. P.F. wanted to introduce Coronado to his mother but Coronado got on his bike and left.

P.F. did not immediately tell his mom what had happened. Rather, he told her a week or two later when he began having a nightmare that Coronado came to his house and molested him. After P.F. told his mom, he told the police.

### B. Testimony of Dr. S. Graff

Dr. S. Graff, a licensed psychologist with an office at the Tri-Counties Regional Center in Oxnard, was qualified as an expert in developmental disorders. He testified that he was contacted in relation to this case because of P.F.'s involvement. P.F. is served by the Tri-Counties Regional Center and, in preparation for his testimony, Graff reviewed P.F.'s chart, which contained evaluations and program plans dating back to 1986. Graff had not personally worked with P.F.

Graff testified that regional centers are a "series of private and nonprofit agencies with contracts with the State of California which are designed to provide services and support for persons who have qualifying developmental disabilities as defined in the Welfare and Institutions Code . . . ." He explained that "the law defines a qualifying developmental disability as autism, intellectual disability, cerebral palsy, epilepsy, or . . . a condition . . . requiring treatment similar to that of a person with intellectual disabilities." A qualifying disability must be evidenced prior to the age of 18, and the person must be "substantially disabled in three or more areas of life," such as "self-care, receptive and expressive language, learning, mobility, self-direction, capacity for

10.

independent living, and economic self-sufficiency." A qualifying developmental disability is considered a "life-long substantial disabling condition" that will not get better and, therefore, regional center clients remain clients for life.

P.F. applied and was deemed eligible for regional center services in 1985, when he was approximately four and a half years old, with a diagnosis of "pervasive developmental disorder not otherwise specified," "mental retardation" in the mild range, and Tourette's syndrome. Graff explained that these were the terms used at the time, but "pervasive developmental disorder not otherwise specified" since has been included in the more encompassing term "autism spectrum disorder," and "mental retardation" is now referred to as "intellectual disability."

Graff reviewed documents relating to P.F.'s diagnosis and symptoms and opined that, when he was 14 years old, he would have functioned similarly to a child of seven and a half to eight and a half years old in his communication, daily living, and socialization skills. He opined that, even when P.F. was 17 years old, he would function more at the level of a child, and that he has always functioned at roughly 60 percent of his chronological age.

Graff explained that persons with autism have trouble understanding the social intent of others and putting themselves in others' shoes. They may not look at faces to get emotional content or may misread facial expressions. People with intellectual disability may lack capacity to process quickly or understand "how they're being abused," and may also misread social cues. Persons who have both intellectual disability and autism are at risk for predation and for being considered rude and inappropriate.

C.      **Testimony of Officer S. Tolley**

S. Tolley is a retired San Luis Obispo police officer. In 1998, while still working on patrol, Tolley worked a case involving a molestation in a bathroom at a park. He conducted surveillance in the area of the park where the incident occurred and saw an individual matching the description given by the victim near the same restrooms where

11.

the incident happened. Tolley and a lieutenant followed the individual to a market and spoke with him there. Tolley made arrangements for the individual to meet with him at the police station, but the individual did not appear.

On December 11, 1998, Tolley received a call from Coronado, who reported he did not show up at the appointed time because he could not get a ride. He denied knowing why the police needed to talk to him. When Tolley told him why they needed to speak, Coronado said, "I even have an alibi." Tolley told Coronado they had a witness that saw him near the restroom, at which point Coronado acknowledged he may have been in the restroom, but denied having oral sex with anyone.

Tolley spoke with Coronado again on December 16, 1998, in an interview room at the police department. Coronado acknowledged being at the park on Halloween day and having a conversation with someone near the playground. He also admitted to being in the restroom with someone there. He described the person in the restroom as, "[o]ne of those people that are out for pleasures." He described the other person as "talking to him as normal" and looking to be about 18 or 19 years old. He stated, "If I had a curiosity, I would make sure he wasn't a minor." He denied touching himself or the other person in the restroom. He acknowledged he talked to the person about whether he had ever masturbated before and had additional conversation about masturbation. Coronado then asked the person to "go ahead and do it."

## VI.    Expert Testimony of Dr. E. Simon

Dr. E. Simon is a clinical and forensic psychologist who has been conducting sexually violent predator evaluations for approximately 17 years. He was qualified as an expert in sexually violent predator evaluations and psychology, and was qualified to render an opinion pursuant to the Sexually Violent Predators Act.

Simon completed approximately 1,600 evaluations of offenders with a mental disorder as a contractor for DSH. (See Pen. Code, § 2960, subd. (a) [regarding treatment

12.

of "prisoners who have a treatable, severe mental health disorder that was one of the causes of, or was an aggravating factor in, the commission of the crime for which they were incarcerated"].) He also completed sexually violent predator evaluations for DSH as a contractor and, from 2012 through the time of trial, worked as a state employee at DSH. He has completed approximately 1,035 initial sexually violent predator evaluations, and approximately 185 update evaluations. In fewer than 10 percent of cases, he opined that the subject met the criteria for sexually violent predator commitment. In some cases in which he found the individual did not meet the criteria, he was subpoenaed to testify for the defense. Simon is not paid extra to reach any particular conclusion or to testify at trial, but is compensated through his regular salary for court appearances and testimony.

Simon explained the sexually violent predator evaluation process as follows. The process begins with the Board of Parole Hearings screening inmates who have committed sexual offenses to determine, prior to release into the community, whether the inmate meets the screening criteria to be referred to DSH for evaluation. If the inmate is referred to DSH, DSH assigns two evaluators, like Simon, to evaluate the inmate. DSH evaluators review a packet of documents relating to the inmate, including police reports, probation officer reports, incident reports from within prison or jail, a record of arrests and prosecutions (RAP sheet), medical records, psychiatric records, and all the inmate's prison records, including "CDCR 115's," which Simon explained are incident reports regarding significant rule violations in prison. Additionally, if the individual has been in DSH custody, the evaluator reviews DSH records. The evaluator may review historical evaluations done by other doctors but cannot review a contemporaneous evaluation being completed by the second evaluator. The evaluator also will meet with the inmate if the inmate agrees. The evaluator's findings are summarized in a report. If both evaluators agree the individual meets the sexually violent predator criteria, the process continues to a probable cause hearing. If probable cause is found, the individual is held for trial.

13.

Simon explained that Coalinga State Hospital (the State Hospital), where Coronado is housed, was built primarily to house sexually violent predators. Several hundred sex offenders are housed there, and many are being treated there. In addition, patients who are dually classified as sexually violent predators and offenders with a mental disorder are housed at the State Hospital, as are some individuals classified solely as offenders with a mental disorder, although they are housed in a different unit. All the patients are men.

Simon evaluated Coronado on approximately seven or eight occasions. In Simon's first report regarding Coronado, dated August 23, 2010, he reached the conclusion Coronado was not a sexually violent predator. In this first evaluation, Simon was using different instruments than he currently uses. Additionally, Coronado declined to be interviewed, and Simon lacked some information he later obtained. For example, Simon initially did not have information regarding Coronado's lack of long-term romantic relationship stability, which is predictive of a person's risk of committing a new offense. Without such information, he considered Coronado's case a "wobbler," meaning it was not clear whether he was a sexually violent predator. However, Simon reviewed another doctor's report in 2013 and was able to glean information on this point that caused him to score Coronado higher on the risk assessment instrument and to determine he "passed the risk threshold." Simon therefore changed his opinion to find that Coronado met the sexually violent predator criteria. Coronado eventually met with Simon in 2015 and corroborated the information regarding his lack of long-term relationships. Since that time, Simon has continued to find that Coronado meets the sexually violent predator criteria. Coronado did not agree to meet with Simon again after the 2015 interview.

In conducting sexually violent predator evaluations, evaluators consider the following three criteria: whether the person has committed a sexually violent offense, as defined by law (criterion A); whether the individual has a diagnosed mental disorder that

14.

predisposes the individual to the commission of future sexual offenses (criterion B); and whether the individual is likely to commit new predatory sexually violent offenses (criterion C).

Simon opined that Coronado satisfied criterion A. In forming his opinion on this criterion, Simon considered Coronado's convictions for offenses against A.A. and P.F., as well as uncharged offenses involving G.S., M.C., and M.S. He noted that Coronado's convictions against A.A. for forcible sodomy and forcible oral copulation, which involved the use of force, violence, or threats, are statutorily enumerated qualifying offenses.

Simon also testified that Coronado met criterion B, i.e., having a diagnosed mental disorder that predisposes him to the commission of future sexually violent predatory offenses. Simon diagnosed Coronado with pedophilic disorder, alcohol use disorder, and other specified personality disorder with antisocial features or traits. Only the diagnosis of pedophilic disorder meets this criterion, but the other diagnoses constitute risk factors. Simon described pedophilia as the deviant sexual arousal to prepubescent children, usually under the age of 12 or 13. Simon explained that Coronado's offenses involved "about 25 years of deviant sexual arousal to prepubescent children." Simon explained that it is common for people with pedophilic disorder to continue to offend as their victims age into pubescence. It also is common for people with pedophilic disorder to have a sexual interest in adults. Simon did not diagnose Coronado with incestual-type or intrafamilial-type pedophilia because he offended against P.F., who was not a family member. He did not diagnose Coronado with hebephilic disorder, which he described as a sexual interest in pubescent children, because this diagnosis is not contained in the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition (DSM-5 or DSM), it is a "political can of worms," and it was unnecessary to do so.

Simon explained that a diagnosed mental disorder is statutorily defined as a "congenital or acquired condition affecting the emotional or volitional capacity that

15.

predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the safety and health of others." (§ 6600, subd. (c).) He opined that Coronado's pedophilia meets this definition because his criminal history reflects that he lacked volitional control: he sexually reoffended against A.A. after being detected of having committed sexual offenses against P.F., and after being adjudicated and suffering criminal consequences. Simon pointed out that Coronado was on probation for the offense against P.F. when he offended against A.A. Simon explained that an individual who has a history of noncompliance while on supervision has an increased risk of committing a new sexual offense.

Simon based his diagnosis of alcohol use disorder on Coronado referring to himself as an alcoholic and his history of very significant alcohol use, including multiple "DUI's." Simon explained that he diagnosed Coronado with other specified personality disorder with antisocial features or traits, rather than antisocial personality disorder, because the latter diagnosis requires evidence that the disorder manifested before the person was 15 years old, and he did not find evidence of Coronado "getting in trouble a lot" before that age. However, both diagnoses involve disrespect for societal rules and disregard for the rights of others. In reaching this diagnosis, Simon considered Coronado's arrests and prosecutions, his prison rules violation reports, and incident reports from the State Hospital. Simon noted that Coronado had "[m]any" rules violations while at the State Hospital. He opined that a history of rule breaking while in the State Hospital shows poor impulse control. He further testified that a perpetrator's failure to stop when asked by the victims could be a "part of the personality disorder," or "could be about impulse control."

Simon acknowledged that Coronado had not sexually reoffended while in a locked facility where he had no access to children. He nonetheless opined that Coronado continued to have pedophilic disorder, which Simon likened to a sexual orientation, in that it does not change or stop over time. Simon noted Coronado had not been caught

with child pornography in the correctional setting.  However, Simon expressed concern that Coronado was involved in incidents in which he was alone with other patients, including an incident in which he was found in a darkened room with an offender with a mental disorder.  Simon explained that offenders with a mental disorder are more vulnerable to sexual exploitation by patients who are sexual violent predators.  Simon also opined that Coronado continued to have a personality disorder, inasmuch as he "continued to amass rule violations, both in prison and at the State Hospital."

Finally, Simon opined that Coronado met criterion C, being likely to commit new predatory sexually violent offenses in the future as a result of his mental disorder.  He reached this opinion by employing an actuarial risk assessment tool called the Static-99R, which includes 10 "static" or unchanging factors, which he considered alongside several other dynamic risk factors.  Simon explained that the Static-99R has "moderate accuracy," or approximately 70 percent accuracy, in predicting a person's risk of committing a new sexual offense.

Simon gave Coronado a score of five on the Static-99R.  Simon scored Coronado on the Static-99R as follows:  (1) minus one point on the first factor, age, based on Coronado being 59 years old at the time of trial[6]; (2) one point on the second factor for not having a period of at least two years of living continuously with a lover; (3) zero points on the third factor because he was not convicted of a nonsexual violence offense at

---

[6] Had the trial been conducted a few months later, when Coronado was 60 years old, Simon would have given him a score of minus three on this factor, which would have reduced Coronado's total Static-99R score to three.  The recidivist estimate for a score of three is lower than that for a score of five.  Simon also acknowledged that some studies show inmates from California tend to show a lower recidivism rate than others, indicating the Static-99R might overpredict recidivism for inmates in California.  However, Simon was not "too concerned" about this possibility because he believed the studies were based on short timeframes and small numbers of recidivist offenders.  Additionally, Simon noted that "age decreases the chance of committing a new sex offense for all sex offenders, . . . but much more so for rapists than pedophiles."  Simon therefore opined Coronado "still meets the likely threshold to reoffend."

the time of his most recent sexual offense; (4) zero points on the fourth factor because he had no prior convictions for nonsexual violence; (5) one point on the fifth factor because he had prior sexual offenses against P.F. prior to the most recent sexual offenses against A.A.; (6) one point on the sixth factor because he had at least four convictions of any kind prior to the most recent sexual offense; (7) zero points for the seventh factor because he had no convictions for noncontact sexual offenses; (8) one point for the eighth factor because he had a victim (P.F.) who was not related to him; (9) one point on the ninth factor because he had a victim (P.F.) who was a stranger; and (10) one point on the 10th factor because he had male victims.

Coronado's score of five on the Static-99R put his relative risk in the 84th to 92nd percentile, meaning his score was higher than about 83 percent of other sex offenders. The recidivism rate for someone with a score of five is approximately 2.7 times higher than that of the average sex offender. Offenders with a score of five are detected of committing a new sexual offense within five years at the rate of 12.8 percent, and within 10 years at the rate of 18.8 percent. However, "[w]e know that way more sex offenses are committed than are detected." Accordingly, this assessment tends to underestimate the actual risk of actual recidivist sexual offenses.

Because the Static-99R is only moderately accurate in predicting risk, evaluators must also consider dynamic risk factors that have been determined to be predictive of the risk of sexually reoffending. Simon determined Coronado exhibited the following dynamic factors: (1) offenses involving sexual coercion; (2) preference or strong sexual interest in children under the age of 14; (3) absence of sustained relationships with adults; (4) lifestyle impulsivity, as reflected in Coronado's use of alcohol and stimulants and his "revolving door criminal lifestyle"; and (5) social deviance or resistance to rules and supervision, as reflected in Coronado's criminal history, probation violations, rules violation reports in prison, and incident reports at the State Hospital. However, Simon determined Coronado did not exhibit the following dynamic risk factors: (1) grievance

thinking, hostility, or bitter or paranoid characteristics; and (2) externalizing behaviors when stressed or reacting out with aggressive behaviors. Simon also did not see a lot of evidence to support an additional dynamic factor: hypersexuality or sexual preoccupation. However, upon further reflection, Simon noted that the number of Coronado's offenses and his alleged instigation of "kiddie orgies" would constitute evidence of hypersexuality or sexual preoccupation.

Simon also considered whether Coronado had any protective factors that could predictively lower his risk or protect against sexually reoffending. Simon concluded Coronado did not exhibit any of the three relevant protective factors: (1) having been in the community without being detected of sexually reoffending for two or more years, (2) having an illness or a physical condition that significantly decreases the motivation or ability to sexually reoffend, or (3) having successfully completed a cognitive behavioral treatment program for sex offenders. Simon noted that Coronado was repeatedly offered, but declined, sex offender treatment.

Based on the Static-99R and Simon's assessment of Coronado's dynamic and protective factors, Simon opined Coronado is "likely to commit a new predatory sexually violent offense." Simon explained that an offense is predatory if the victim is a stranger or casual acquaintance, where the relationship is established primarily for the purpose of victimization. Simon further explained, that Coronado's family member victims had grown up and "given the fact that he has a pedophilic disorder, he's got this personality disorder with strong antisocial traits, and he's committed at least one predatory sex offense, it seems reasonable to conclude that if he were likely to commit a new sex offense, it would be against a nonfamilial victim." However, Simon acknowledged that Coronado's offenses against family members were not predatory and his offenses against P.F. were not violent, and Coronado therefore has never been convicted of a sexually violent predatory criminal offense.

19.

## VII.    Expert Testimony of Dr. L. Sidhu

Dr. L. Sidhu is a licensed psychologist employed by DSH to conduct sexually violent predator evaluations.  He was qualified as an expert in sexually violent predator evaluations and psychology, and qualified to render an opinion pursuant to the Sexually Violent Predators Act.  Since 2006, he has handled approximately 825 unique sexually violent predator cases.  In his first 10 to 15 years of conducting these evaluations, he found the person met sexually violent predator criteria in approximately 10 to 11 percent of cases.  In the year and a half preceding trial, his positive percentage rate doubled to approximately 24 percent.  He attributed the change to an increase in the screening threshold used by the prison system to determine whether to forward a case to DSH for evaluation, which resulted in DSH receiving fewer cases that are "fairly easy to find negative," and more cases that are "difficult and probably not as clear-cut."

Sidhu evaluated whether Coronado met the criteria to be a sexually violent predator.  He first evaluated Coronado in 2011 and thereafter conducted six update evaluations, the last of which was in 2023.  He initially reviewed probation officers' reports, documentation of Coronado's behavior in prison, and court documents relating to his convictions.  In subsequent evaluations, Sidhu also had access to Coronado's records from Coalinga State Hospital and documents relating to uncharged offenses not described in the original reports.  Additionally, Coronado agreed to an interview on one occasion, in 2015.

Sidhu opined that Coronado's offenses against A.A. met criterion A for considering him a sexually violent predator.  He noted these are statutorily enumerated qualifying offenses.

Sidhu also opined that Coronado had a diagnosed mental disorder that satisfied criterion B.  Sidhu diagnosed Coronado with other specified paraphilic disorder with pedophilic and hebephilic traits.  He explained that a paraphilic disorder involves "urges, interests, or sexual drives . . . directed towards things that we would not consider to be

20.

normative." The phrase "other specified disorder" refers to "individuals who demonstrate symptoms and traits of particular pathologies that are not better captured by a specific specified disorder."

Pedophilia, which involves sexual interest and urges directed toward prepubescent children, usually under 13 years old, is a specifically listed paraphilic disorder. Hebephilia refers to individuals who are attracted to pubescent or postpubescent children, generally in the range of 13 to 15 years old. Sidhu acknowledged hebephilia is a controversial diagnosis and some practitioners do not feel it meets the threshold for a diagnosable disorder. Sidhu explained that most adult men will demonstrate a psychological interest toward postpubescent adolescents; however, to reach the threshold of a disorder the person must act on the interest, and their behavior must lead to distress or problems, such as legal repercussions. Sidhu explained that Coronado is diagnostically complicated because he engaged in offenses against multiple children beginning when they were five years old, indicating a pedophilic interest, but he continued his behaviors until the children were 13 or 14 years old, indicating hebephilic interest. Sidhu acknowledged that Simon diagnosed Coronado with pedophilic disorder. However, Sidhu did not think pedophilic disorder was sufficient to capture Coronado's diagnosis, given his other behaviors.

Sidhu's diagnosis was unaffected by Coronado's lack of offenses against children or adolescents in the prior 20 years. He explained that paraphilia tends to describe a chronic condition that can only be addressed and mitigated through treatment, and Coronado had not participated in sex offender treatment while at Coalinga State Hospital. Additionally, Coronado had been in prison and hospital settings that did not provide access to children, so he would not be expected to have actual victims in the age range during that time. Sidhu acknowledged that "child pornography exists at the hospital" and individuals have been caught with it. However, "not everybody is going to access that,"

21.

and it is possible to have a current diagnosis of pedophilic and hebephilic traits without possessing child pornography or viewing children's television shows.

In considering whether Coronado's diagnosis qualified him as a sexually violent predator, Sidhu also considered Coronado's volitional impairment, i.e., his lack of ability to self-regulate and manage his behaviors, even after being made aware that his behaviors are problematic or inappropriate. In this regard, Sidhu noted Coronado's qualifying offense occurred while he was on probation for a prior sexual offense. Sidhu also considered Coronado's emotional impairment, i.e., whether he has emotional dysregulation or difficulty controlling himself that prevents him from being able to manage his behaviors. In this regard, Sidhu considered Coronado's reoffending, as well as the incestuous nature of his offending, both of which reflect his inability to control his behaviors despite strong societal taboos.

Sidhu did not diagnose Coronado with a personality disorder. He noted Coronado did not have a pattern of antisocial behavior or psychology, his offenses were relatively limited to sex offenses, he had a stable work history, and he had no educational problems. The only factors suggesting a personality disorder were the callous nature of the offenses and Coronado's lack of remorse, but Sidhu did not believe these reflected a "deep-rooted personality disorder."

Sidhu also considered, but rejected, a diagnosis of alcohol use disorder. Sidhu likely would have diagnosed Coronado with alcohol use disorder in the past. However, because Coronado had abstained from alcohol for a lengthy period, Sidhu considered his alcohol use to be in remission.

As to criterion C, Sidhu opined that Coronado is likely to reoffend in a sexually violent predatory manner in the future. Sidhu relied on the Static-99R and dynamic risk factors to reach this opinion. He described the Static-99R as the "best researched, most validated instrument . . . for the assessment of the risk in sex offenders." On the Static-99R, Sidhu gave Coronado a score of five. He calculated this score as follows:

22.

(1) minus one point for his age, (2) one point for lacking a history of a relationship lasting at least two years, (3) zero points for having no nonsexual violence offenses at the time of his qualifying offense, (4) zero points for having no prior nonsexual violence offenses, (5) one point for having a prior sexual offense, (6) one point for having four prior sentencing dates, or four occasions of having come before a sanctioning body, (7) zero points for having no convictions for noncontact sexual offenses, (8) one point for having had a victim who was unrelated to him, (9) one point for having a victim who was a stranger, and (10) one point for having male victims. Sidhu noted that, a few months following trial, Coronado would turn 60 years old, and his score for age would drop to minus three, dropping his total score on the Static-99R to three.

Sidhu explained that a "typical" sex offender will receive a score of two on the Static-99R. Those who receive a score higher than two are at an increasingly greater risk of reoffending. Coronado's score of five puts him well above the average risk of reoffending relative to other sex offenders. He scored higher than 85 percent of other individuals and he "is also found to be at a risk relative to other typical sex offenders to reoffend at a rate of about 2.7 times more." Offenders with a score of five who are considered "routine," as opposed to "high risk," sex offenders, have an absolute risk of reoffending within five years of 13 percent, and within 10 years of 19 percent. Meanwhile, offenders with a score of three land in the average group for reoffending, with an absolute risk of reoffending within five years of 7 percent, and within 10 years of 10 percent. Sidhu deemed Coronado a routine sex offender. An offender with a score of three is about one and a half times as likely to reoffend as a typical sex offender.

Sidhu acknowledged that the Static-99R tends to overreport risk for certain offender groups in California. Additionally, because of changes in how society treats sex offenders over time, risk has reduced over the decades since the instrument came into use.

23.

Sidhu also found the presence or partial presence of four dynamic risk factors that increased Coronado's risk of reoffending: (1) sexual preference for prepubescent and pubescent children, (2) lack of intimate emotional relationships, (3) resistance to rules and supervision, and (4) negative influences. Sidhu described Coronado's sexual preference for prepubescent and pubescent children as the most salient because it drives his behaviors and requires intervention. He noted Coronado described himself as a loner and his familial relationships were conflicted, leaving him with no one to buffer his behaviors. Sidhu determined the factor relating to resistance to rules and supervision was only partially present, and was based on Coronado having a parole violation, a failure to register as a sex offender, and his qualifying offense occurring while he was on supervision.[7] Although Sidhu acknowledged Coronado had rules violations in the hospital setting, these were not significant enough to suggest a significant risk factor. The risk factor relating to negative influences also was only partially present, and was based on Sidhu's assessment that, "whatever social circle he may have had, these were not individuals who were able to mitigate him from engaging in these types of behaviors." Sidhu determined the remaining dynamic factors he considered were not present in Coronado's case.

Sidhu also considered three protective factors that may have mitigated Coronado's risk of reoffending, only one of which applied. The first was Coronado's age, which applied, but also was considered in scoring his Static-99R. The second was whether Coronado had been out in the community, which could have reduced his risk by 5 to 10 percentage points for every five years he spent in the community after committing a

[7] Sidhu explained that, at one point following his incarceration for the offenses against A.A., Coronado was released on parole. Then, in 2011, he suffered a parole violation due to being transient and housed in a shelter that was within prohibited proximity to a school, and without getting approval from a parole officer for this location. The parole hold initiated in relation to the parole violation triggered the sexually violent predator screening process that ultimately led to trial.

sexual offense. However, because Coronado was not released into the community, this factor did not apply. The third and final factor was whether Coronado had participated in a structured sex offender treatment program. Because Coronado did not participate in such programs, this factor did not apply. However, Sidhu acknowledged there was no record of Coronado engaging in sexual misconduct in prison or at the State Hospital.

Sidhu opined that, if Coronado were to reoffend, he would reoffend in a predatory manner. Sidhu based his opinion on Coronado having a prior predatory offense against P.F. Sidhu therefore concluded it was likely any future offending would be predatory as well. He explained that predation requires a victim who is a stranger or someone with whom the offender does not have a substantial relationship, or the relationship is established for the express purpose of sexually offending.

Two additional factors stood out to Sidhu, which were not reflected in the Static-99R or the dynamic risk factors. The first was the reference in the record Sidhu reviewed to Coronado having children engage in sexual activity, which speaks to the strength of his sexual interest and paraphilia. The second was the reference to a journal listing additional victims, which could be construed as keeping a "trophy."

In sum, Sidhu concluded Coronado meets the criteria to be found a sexually violent predator.

On cross-examination, Sidhu acknowledged he may not have found Coronado met the sexually violent predator criteria if he had not considered Coronado's uncharged offenses. The details of those offenses and specific allegations showed Coronado's pattern of behavior and confirmed Sidhu's diagnosis.

## VIII. Parole Status

P. Ocampo is the sexually violent predator coordinator and liaison to Coalinga State Hospital for the Department of Corrections and Rehabilitation Division of Adult Parole Operations. He tracks parole status for any person detained at Coalinga State

Hospital with a sexually violent predator designation and supervises their case. This includes individuals pending trial and those who have already been determined to be sexually violent predators. If an individual is detained at Coalinga State Hospital as a sexually violent predator or pending such determination but not on Ocampo's caseload, parole is inactive, and the Division of Adult Parole Operations does not have jurisdiction and does not supervise or track the case. This occurs when a person has been discharged from parole. A person detained as a sexually violent predator or pending such determination who is not on Ocampo's caseload would not be on parole supervision if released from the State Hospital. Such person would not be required to comply with supervision or GPS monitoring and would not have assistance from parole operations with housing.

Coronado is not on Ocampo's caseload.

## IX. Defense Case

Dr. A. Abrams, a psychiatrist in private practice and a lawyer, testified for the defense as a paid expert in clinical and forensic psychiatry relating to sexually violent predator evaluations, addiction medicine, and "issues concerning memory." He emphasized that he is not a psychologist, stating that, unlike a psychologist, he does not "rely on computers to tell [him] what to do after [he] give[s] a screening test." He has performed hundreds of forensic examinations and has been qualified as an expert in psychiatry hundreds of times. He has performed approximately 150 sexually violent predator evaluations, always on behalf of the patient. He is "self-taught about both the case law and the psychological or mental health studies having to do with sex offenders."

When Abrams was first consulted on Coronado's case, he reviewed reports from Sidhu and Simon from 2020 or 2021 and determined they were "totally bogus" and he did not "think they know what they're talking about." After this initial determination, he reviewed Coronado's prison records; records from Coronado's time at Coalinga State Hospital; records relating to Coronado's offenses against P.F. and A.A.; accounts of

26.

people who came forward after Coronado's arrest in 2001, but whose cases were not prosecuted; a probation report relating to the offenses against A.A.; and M.S.'s deposition testimony.

Abrams opined that Coronado's three offenses against A.A. constituted qualifying offenses for purposes of finding him a sexually violent predator. However, Coronado's offenses against P.F. were not qualifying offenses because they were misdemeanors and involved "consensual sex with a person who was just slightly shy of being 18," and thus did not involve force or violence and were not predatory. Abrams determined Coronado had no other qualifying convictions. Abrams opined there was no evidence Coronado ever committed a predatory sexual offense "that was confirmed."

When considering uncharged allegations, Abrams tries to "understand if there's a motive for the allegations being raised after somebody's arrested and it's in the newspaper and people come forward. [He tries] to understand why they would not have raised the allegations earlier, why they raised them at the time, and do the allegations seem to fit some sort of pattern that makes their information helpful or not helpful." He also considers whether the allegations are supported by objective evidence, and whether "the stories" are consistent or have "huge gaps that nobody's tried to investigate," or that were investigated but not prosecuted "because the investigation said these gaps are too big to jump over." Abrams also testified that "memory is not the same as a videotape." He testified "the way people are questioned about past events" may cause them to believe something other than what really happened. Some studies indicate that memories of events that did not occur can be suggested or implanted. Additionally, memory can change over time, memories of one event can be transposed with details of another event, and a person's memory of one person can be conflated, or replaced, with another person.

Abrams did not diagnose Coronado with any current mental disorder when he evaluated him in 2023. In determining whether Coronado had a qualifying mental disorder, Abrams considered the DSM, but also "descriptive articles and actual

27.

experience." Abrams saw no evidence Coronado had a then-current sexual paraphilia, and Coronado was not drinking and had no antisocial features. Abrams determined Coronado had never been in a psychiatric hospital or in a mental health treatment program while in prison. He found no signs or symptoms of a recognized mental illness in Coronado's records or evaluations about his mental state. Abrams opined that Coronado's abuse of A.A. was "fueled by social factors, not a mental illness, i.e., severe family dysfunction to say the least."

Abrams disagreed with the diagnoses provided by Simon and Sidhu, who Abrams referred to as "Tweedle Dee or Tweedle Dum," and asserted their diagnoses did not "comport[] with standard practice," were inaccurate, constituted a hunch, and merely represented what the evaluators wished the court or jury to believe.

Abrams disagreed with Simon's diagnosis of alcohol use disorder because, although Coronado had a history of "drinking too much," this is not necessarily coextensive with an alcohol use disorder. Additionally, Coronado had been sober for 20 years and "even at his worst, he wouldn't have met the criteria." When Abrams interviewed Coronado in 2023, he found no evidence Coronado was abusing alcohol. He did not believe the lack of alcohol use was solely attributable to Coronado being in a controlled environment, given the widespread availability of inmate-made alcohol in prison. He also acknowledged Coronado engaged in an 18-month drug rehabilitation program when he first entered the State Hospital and could not use drugs without the risk of engaging in "stupid" and potentially criminal behavior. He acknowledged that drug and alcohol relapse rates upon exiting a custodial setting are "very poor."

Abrams disagreed that Coronado met the criteria for antisocial personality, antisocial features, or psychopathy, because Coronado had no history of "strong-arming people to steal their money," fraud, credit card theft, or "repeated violations of people's rights." Instead, Coronado's history in the prison system showed only minor write-ups for "having a green chili that he found on a truck bed," "[n]ot going to work because he

28.

couldn't find his I.D.," and having "an MP-3 player or an iPod," none of which violated the rights of others.

Abrams disagreed that Coronado could be diagnosed with pedophilia or unspecified paraphilic disorder with pedophilic and hebephilic inclinations. Abrams noted that a search warrant executed when Coronado was arrested in 2001 found three videos, "one that didn't work, and two that were of adult heterosexual behavior," and two magazines of "hot hunky guys." Abrams stated the materials did not involve child sexual abuse and "had nothing to do with pedophilia." If Coronado had pedophilia, Abrams would have expected a search of his house or computer in 2001 to yield a "trove of images," magazines, and videos, and would expect Coronado to have a history of "work[ing] part-time as a baby-sitter . . . or volunteer[ing] with the Boy Scouts, or all the things that real pedophiles do."

Abrams also stated pedophilia generally applies to offenses outside the family, while incest applies to offending within the family. Incest involving prepubescents is "usually fueled by very different psychological states" than those that fuel predatory offenses outside the family. Simon would not diagnose someone with pedophilia based solely on their having a known victim who was 15 years old. Rather, he would expect to see someone with pedophilia victimizing eight-year-olds, and would expect to see "[c]onvictions, arrests, [and] expulsions" from the community.

Abrams also noted that Simon diagnosed Coronado with pedophilia in 2010 but, by that time, Coronado's offenses were 10 years old. Abrams noted that sexual preferences can change over time and mental disorders can go into remission. He disagreed that pedophilia can never go away. Abrams acknowledged Coronado "possibly had some sexual interest in young children, young boys," between 1990 and 2001, and may have met the criteria for pedophilic disorder during that time. He was unable to assess whether Coronado had pedophilic disorder at the time of the interview, but found no evidence that Coronado had current sexual paraphilias. Even if Coronado spent 10

29.

years "terrorizing . . . every younger member of his family, with sexual abuse," Abrams would not consider this sufficient evidence of "a current mental disorder that predisposes a person to commit extrafamilial child abuse," given that the abuse stopped over 20 years ago. Had Abrams evaluated Coronado in 2002 or 2004, he probably would have diagnosed him as engaging in incestuous child abuse, a diagnosis he acknowledged is not in the DSM.

Abrams noted that individuals in the State Hospital have "ways [to] be pedophilic and get stimulated," such as possessing legal pornography that depicts teens who appear to be 12 years old, being pen pals with "Needy Boy Scouts or foster children," or "turn[ing] on Brittany Spear (sic) . . . movie videos." However, he found no evidence Coronado was interested in "children's programming" or possessed "edgy" pornographic materials. The "worst" Abrams saw in Coronado's records was an indication he may have been having sex with other inmates, but the records were not explicit, instead indicating he "was in a dark room with another inmate." There was no confirmation in the records that Coronado was having sex, and, in any event, any suspected activity was with adults without any evidence of sexual coercion.

Abrams disagreed with the diagnosis of hebephilia, which he characterized as "[b]eing attracted to attractive people," which is not pathological. He added, "[N]obody believes hebephilia." Abrams also characterized being sexually interested in 16-, 17-, and 18-year-olds as normal, describing this group as "the most reproductively sound people of the population."

With regard to Coronado's risk of future offending, Abrams emphasized the difference between "interfamilial behaviors that may have occurred when the nephews were prepubescent or after they had entered puberty," and predatory behavior. Abrams explained that interfamilial incest either disappears when the family members grow up and children are no longer available to the abuser, or it becomes "predatory forms of pedophilic behavior." It is not "expected" for offenders whose offenses are primarily

30.

within the family to offend against strangers. Abrams did not see factors that would indicate Coronado was "a real pedophile" who would not stop once family member children were no longer available to him.

Abrams described the Static-99R as "distantly related" to whether Coronado will engage in sexually violent predatory criminal behavior because of mental illness in the future, inasmuch as it "at best, mildly predicts whether someone's going to be arrested or convicted or violated for something seemingly sexual." He described the instrument as "a hunch based on data" that has not been subjected to "real testing." Additionally, a recent study showed the Static-99R overestimates the risk of reoffending for California offenders by 200 to 300 percent, and overreports the risk for persons, such as Coronado, who are Hispanic or Latino. Abrams scored Coronado a five, or possibly a four, on the Static-99R. With Coronado turning 60 years old soon after trial, Abrams agreed that his score would drop to a three, or possibly a two, which, in Abrams's opinion, would indicate someone who does not need to be referred for sexually violent predator proceedings.

Abrams did not find the dynamic factors relied on by Simon and Sidhu to be "psychologically meaningful" and stated they were not validated by research. Rather, Abrams believed the most meaningful factors were "strong deviant preoccupation and failed inhibition," or the inability to control oneself. Abrams did not see evidence of Coronado having an inability to control himself. He noted Coronado is described in prison and hospital records as well behaved, he voluntarily complied with a "vast number of regulations," and he stopped when A.A. told him to stop. He acknowledged, however, that there were many times Coronado did not stop when asked by his victims. Abrams did not view Coronado's denial of the offenses as a significant indicator of his future risk.

Abrams estimated Coronado's chance of reoffending at 5 percent, meaning "if there were 100 Mr. Coronados released onto the street, 95 of them would not reoffend." Ultimately, Abrams opined Coronado did not meet the criteria to be a sexually violent

31.

predator because he did not have "a mental illness that predisposes him to be likely to commit future sexually violent predatory actions."

On cross-examination, Abrams agreed that he had never testified on behalf of the prosecution in a sexually violent predator case, had never written reports that find an individual meets the sexually violent predator criteria, and only testified in cases in which he opined a person did not meet the criteria. He billed for approximately 35 hours of time on this case the year prior to trial and estimated he would bill for another 35 hours in the year of trial. He was being paid a discounted rate of $500 per hour to testify.

## DISCUSSION

### I. Admissibility of Evidence Regarding Minor Misconduct and Interactions with Other Patients

Coronado contends the court abused its discretion by admitting evidence suggesting that he committed specific minor acts of misconduct and was discovered in certain circumstances with other patients during his detention with DHS. We disagree.

#### A. Additional Background

##### i. Motions in Limine

During motions in limine, defense counsel moved to exclude evidence of Coronado's misconduct while at the State Hospital. The People indicated they intended to introduce interdisciplinary notes from the State Hospital reflecting conduct relied upon by the People's experts in forming their opinions. One instance involved Coronado "throw[ing] a fit" or having a "temper tantrum" and yelling at staff about the form in which his medication was administered. The court noted that this evidence was "so marginal in terms of its relevance," particularly given that Coronado had been living at the State Hospital for over a decade. The court stated it would exclude this evidence on the ground it would involve an undue consumption of time and would be a waste of time.

Additionally, the People stated their intent to introduce (1) evidence of an instance in February of 2023 in which Coronado cursed, yelled, and got aggressive with staff;

32.

(2) instances of him refusing to attend his treatment team meetings to address his risk factors; and (3) repeated incidents in which he was "not receptive to education regarding the fire hazard of hanging towels on curtains." The court determined that Coronado's refusal to attend treatment was relevant and admissible. However, the court stated it would exclude evidence of the yelling incident and the towel incident on the grounds that these had minimal probative value and would constitute a waste of time. The court noted, "[Y]ou have such a copious amount of true alleged serious misconduct that the jury is going to deal with that bears directly on the elements at issue here, that I think at a certain point it just becomes so cumulative and of such little additional value that I'm not going to allow it."

The People also stated their intent to introduce evidence of incidents in which Coronado was found with other patients "off unit," which the experts relied on to conclude Coronado was being sexually active within the State Hospital. One such incident involved Coronado being found in a typewriting room with the lights off with an offender with a mental health disorder, which was against unit rules, and in relation to which Coronado subsequently was tested for sexually transmitted diseases and required to meet with his treatment team. The People explained that offenders with a mental disorder "tend to be less functioning" and this incident therefore implied Coronado was having sexual contact with a "lower-functioning patient," which was consistent with his pattern of behavior of committing offenses against "lower-functioning individuals." Defense counsel countered that there was no direct evidence that anyone saw Coronado engaged in a sexual act with another person at the State Hospital. The People stated there were "a few of those throughout the years where he's caught in the stairwell with other patients, things like that, and [the prosecutor] should be allowed to introduce that pattern of going off unit when he's not allowed to be, getting caught with other patients."

The court characterized this as evidence of "a rules violation that he was somewhere where he wasn't supposed to be," and that any relevant inferences to be

drawn from the evidence were speculative. The court stated it would permit the People to "elicit the fact that he's had some rules violations," but would not permit the People to elicit details regarding any of these incidents. The court further stated, "[I]f the defense is going to dispute that he's violated various rules a couple of times, then that might open the door for you." Otherwise, however, the incidents were of little value given the time the evidence would consume.

The People then sought permission to enter the interdisciplinary notes themselves into evidence. The court stated it was not inclined to admit in written form the evidence it had excluded in testimonial form. Thus, to the extent the notes were admitted, the excluded evidence would need to be redacted.

### ii. Defense Opening Statement

In his opening statement, Coronado's counsel acknowledged that Coronado had been convicted of three qualifying child molestation offenses relating to acts against his 15-year-old nephew in 2001, and that "everything [the jury was] going to hear about in this trial dates from 2001 or before." He then stated,

> "It's correct that [Coronado] has largely been in custody . . . in the intervening years. But . . . you'll hear, *he's been in settings and scenarios where he could have reoffended, or he could have acted out by breaking rules, by behaving inappropriately sexually since 2001, 2002, when he was taken into custody.*

> "You'll hear that he has -- you won't hear any evidence of sexual misconduct on his part since 2001, and that's what I would like you to think about a lot during this trial. Because what this trial is about isn't did he do something that was sexually violent and predatory? That's not what this is really about. What this trial is really about is does he currently, here today in 2024, does he currently pose that substantial and well-founded risk of committing a sexually violent predatory offense?

> "Now, I'll acknowledge the evidence is going to show that he hasn't been around kids for the last 20 years. He served his time in prison for those three counts that I told you about. And then through the vagaries of the criminal justice system and this process, he's been at [the] State

34.

Hospital since about . . . 2011, . . . *and in all that time no sexual misconduct.* You won't have any evidence of that. And that's what I'm going to emphasize throughout this trial." (Italics added.)

Defense counsel also emphasized that Abrams, the defense expert, would opine that Coronado did not have a diagnosable mental disorder. Instead, Abrams would opine that Coronado struggled with drinking and substance abuse in the years leading up to his arrest and conviction, "[b]ut there's no current evidence of a mental disorder that relates to sexually violent predatory criminal behavior. *And again, that's because of the many, many years of good behavior, of lack of inappropriate sexual behavior in the State Hospital.*" (Italics added.)

Thereafter, the prosecutor requested to reopen the court's ruling regarding the rules violations and interdisciplinary notes. The prosecutor argued defense counsel's opening argument "went into great detail about how he's going to emphasize that [Coronado] has not had any rule breaking, has had many years of good behavior, has not broken the rules even in settings where he would be expected to act out and break rules." Defense counsel responded that his "intention was to point to the lack of sexual misconduct, proven sexual misconduct on the part of [Coronado] while in the [DSH]." He argued the proposed exhibits regarding Coronado's behavior were cumulative and more prejudicial than probative.

Defense counsel specifically objected to a note from October 2019 that stated Coronado was "allegedly identified as a sexual contact with another peer" and described test results regarding a sexually transmitted infection. The court agreed with defense counsel that this language was prejudicial and stated an inclination to exclude the October 2019 note. The court queried whether consensual sex with other patients in the State Hospital constituted a rules violation, and the prosecutor confirmed it did not. The prosecutor confirmed the exhibit did not describe a rules violation but asserted it showed Coronado was "still sexually active," which she argued was relevant to his risk of

35.

reoffending, particularly if the defense intended to argue Coronado, at nearly 60 years old, was too elderly to be dangerous. The court again stated it was inclined to exclude the exhibit.

However, the court acknowledged it had ruled the People could point out Coronado had rules violations without admitting the details of these incidents. The court then stated to defense counsel, "You . . . told them you expect the evidence to show that he hasn't done anything wrong while in the hospital." Defense counsel asserted his comments referred to "[s]ignificant sexual misconduct." Ultimately, the court stated it was sympathetic to the argument that the rules violations were minor, but that it was inclined to provide the jury with all the notes and exhibits so that they could assess the weight of the evidence. The court specifically stated the evidence appeared to be relevant and admissible. The court invited defense counsel to make specific objections to specific documents within the notes.

The prosecutor referred to several specific incidents she intended to ask her experts about: (1) an April 2013 incident in which Coronado was in a stairwell with another patient, outside of staff supervision, (2) a November 2013 incident of Coronado being written up for having another patient in his bedroom unsupervised, (3) a May 2014 incident where staff found Coronado in a typewriter room with another patient and tried to redirect him, after which he was found with that peer in a stairwell, and (4) a September 2019 incident in which he was in a typewriter room with the lights off with an offender with a mental disorder. The court ruled that "these type[s] of records are admissible" and relevant. However, the court required the People to redact references to a sexually transmitted infection and to an "alleged sexual contact encounter" due to lack of foundation. Defense counsel stated he would review the materials and suggest further redactions.

36.

### iii. Exhibits

Following a lengthy discussion, records regarding Coronado's rules violations and treatment notes were admitted into evidence.

Defense counsel objected to a record indicating Coronado "had a[n offender with a mental disorder] patient in [the] typewriter room" on the ground there was no foundation for the statement that the other patient was an offender with a mental disorder. The court overruled the objection.

Defense counsel also objected to a record indicating Coronado was upset with the form in which his medication was provided on the ground this record had been deemed inadmissible during motions in limine. The court agreed its initial inclination was that this was a minor violation, and that the People were permitted to establish Coronado had rules violations without getting into the details. However, the court noted there were additional discussions regarding the probative value of the rules violations given how they factored into the experts' opinions regarding Coronado's dangerousness and whether he had an antisocial personality disorder. The court ultimately ruled the notes had some probative value and were only minimally prejudicial and therefore could be admitted.

Defense counsel objected to records indicating Coronado was found with contraband in his living area, specifically hard drives, an iPod, rewritable CD's, and an MP-3 player. The court ruled the record could be admitted as a rules violation, without any speculation regarding what may be contained on the hard drives given the lack of evidence on that point.

Relevant to Coronado's arguments on appeal, the admitted records referred to the following incidents involving other patients: (1) an April 2013 incident in which Coronado had a verbal disagreement with a peer who saw Coronado visiting with a friend in the stairwell; (2) a November 2013 incident in which a peer was observed exiting Coronado's dorm room, with Coronado reporting the peer was in the room with another patient; (3) a May 2014 incident where Coronado was observed to be interacting with a

37.

peer in the typing room, failed to respond when told to have his visitor at the door, was not easily redirected, and later went to the stairwell to sit with the visitor; and (4) a September 2019 incident in which Coronado was observed entering the typewriter room at 8:00 p.m. and turning off the lights, and subsequently was discovered in the room with an offender with a mental disorder and counseled that this is against the rules.

### iv.  Testimony

Simon testified that Coronado continued to suffer from a mental disorder and cited his prison rules violation and the State Hospital incidents as evidence of a personality disorder.

During Simon's testimony regarding why he believed Coronado continued to suffer from his diagnosed mental disorders, Simon stated, "[I]t has been concerning to me that there were some incidents at the State Hospital where [Coronado] was seemingly engaging in sexual activity with other patients in a way that was not allowed." Defense counsel objected and the objection was sustained. Defense counsel's motion to strike was granted. Counsel did not request a jury admonition regarding the testimony.[8]

Simon then was permitted to testify that there were incidents where Coronado was alone with other patients and this would be concerning. He testified Coronado being alone with an offender with a mental disorder potentially could be of clinical significance. The prosecutor then asked, "And you mentioned the population of [sexually violent predator] patients and the population of [offenders with a mental disorder] patients are kept separate at the State Hospital; is that correct?" Simon responded, "I believe so." Defense counsel objected based on lack of personal knowledge and Simon clarified that he has "had cases like this . . . where the individual is noted to be on the

---

[8] Defense counsel later moved for a mistrial based on this testimony. We discuss arguments relating to the motion for mistrial below in a separate section of our discussion.

[offenders with a mental disorder] unit and they're not allowed to be there, so that tells me that there's separate units." The court allowed this answer to stand.

Simon then testified there was at least one hospital record of Coronado being found alone in a darkened room with an offender with a mental disorder, and this incident was of clinical significance in his risk assessment. When explaining the differences between sexually violent predators and offenders with a mental disorder, Simon stated, "I think of most relevance to all of this is that the [offenders with a mental disorder] patients are considered more vulnerable." He clarified, "they're more vulnerable to sexual exploitation by the [sexually violent predator] patient population." Defense counsel objected that the response lacked foundation and was nonresponsive, but the objections were overruled.

Sidhu was asked if "there [are] more vulnerable patients in the State Hospital," and responded that there are. He was asked whether there were rule violations in Coronado's hospital records, and he confirmed there were, albeit insubstantial rule violations. He acknowledged these violations included acts of aggression, having contraband, his room being out of compliance, and being found with other patients in places they were not supposed to be, such as a darkened room or stairwell. He acknowledged there was no record of Coronado sexually abusing patients at the State Hospital or inmates in the prison.

Abrams testified that Coronado's records included a reference "that maybe he was having sex with other inmates," but the reference was not specific and referred instead to him and the other patient being together in a darkened room. Abrams further clarified that the records did not confirm Coronado was having sex and he was not "caught . . . in the act." Regardless, Abrams emphasized that any sexual activity was with an adult and there was no evidence of coercion. Abrams also disagreed that offenders with a mental disorder are more vulnerable than other patients at the hospital.

## B.     Applicable Law and Standard of Review

Only relevant evidence is admissible.  (Evid. Code, § 350.)  " 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." ' "  (*People v. Gonzalez* (2021) 12 Cal.5th 367, 408.)  "The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner [citation]."  (*People v. Jones* (2013) 57 Cal.4th 899, 947.)

Relevant evidence may be excluded as provided by statute.  (Evid. Code, § 351; see *id*., § 352.)  Under Evidence Code section 352, the court has discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (*Ibid*.)  " 'The "prejudice" which [Evidence Code] section 352 seeks to avoid is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' "  (*People v. Chhoun* (2021) 11 Cal.5th 1, 29, italics omitted.)  The trial court has "broad discretion under Evidence Code section 352 to exclude evidence."  (*People v. Jones*, *supra*, 57 Cal.4th at p. 949.)  Accordingly, we review the court's rulings under Evidence Code section 352 for abuse of discretion.

Errors in admitting or excluding evidence under Evidence Code section 352 generally are reviewed under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Marks* (2003) 31 Cal.4th 197, 227.)  Under *Watson*, we consider whether there is a reasonable probability the jury would have returned a more favorable verdict in the absence of the error.  (*Watson*, at p. 836.)

## C. The Court Did Not Abuse Its Discretion in Admitting Evidence of Minor Acts of Misconduct

Coronado argues the court abused its discretion when it revised its ruling to permit the People to introduce evidence that he had committed minor acts of misconduct during his many years in a custodial setting. Coronado does not argue this evidence was inadmissible. Indeed, he concedes the court could have ruled this evidence admissible during motions in limine, and doing so would not have been an abuse of discretion. Nonetheless, he argues the court abused its discretion when it changed course and ruled, after opening statements, that the evidence could be admitted. He contends the court's interpretation of defense counsel's opening statement was erroneous and there was no valid reason supporting a change to the court's ruling. We conclude the court did not abuse its discretion in determining the evidence was admissible or in altering its earlier ruling holding otherwise.

First, the evidence of minor acts of misconduct was relevant. As stated, the People offered this evidence in support of Simon's opinion that Coronado suffered from a personality disorder, which was a risk factor Simon considered in determining Coronado's likelihood of sexually reoffending. Inasmuch as the evidence was relied upon by an expert to reach an opinion on a fact of consequence in this matter, the acts of misconduct, even if relatively trivial, are relevant. Moreover, although the court initially excluded this evidence due to undue consumption of time, it ultimately admitted the evidence through written records that consumed almost no time. Questioning of the experts concerning these acts also was brief and did not involve any wasteful relitigation of trivial facts concerning these incidents. The court did not abuse its discretion in admitting this evidence.

We additionally note that the court's initial ruling allowed the People to "elicit the fact that he's had some rules violations," but not to elicit details regarding these incidents. The court also cautioned, "[I]f the defense is going to dispute that he's violated various

41.

rules a couple of times, then that might open the door for [the prosecutor]." Despite this statement from the court, defense counsel's opening statement suggested Coronado did not have a record of rule breaking activity in custody. Although defense counsel's opening statement focused primarily on Coronado's lack of sexual misbehavior, parts of the statement could be construed more broadly. For example, counsel stated, "But . . . you'll hear, *he's been in settings and scenarios where he could have reoffended, or he could have acted out by breaking rules*, by behaving inappropriately sexually since 2001, 2002, when he was taken into custody." (Italics added.) Additionally, when explaining that Abrams would opine that Coronado did not have a qualifying mental disorder, counsel stated, "And again, *that's because of the many, many years of good behavior*, of lack of inappropriate sexual behavior in the State Hospital." (Italics added.) We therefore disagree with Coronado's contention that the court's ruling was based on a "false memory of [defense counsel's] opening statement." We cannot say the court abused its discretion in determining counsel's opening statement opened the door to the prosecutor admitting evidence that Coronado's record was not free of rule-breaking behavior.

Furthermore, as the court noted, there was additional discussion regarding the probative value of this evidence after the court's initial ruling on motions in limine. The court ultimately determined the evidence had probative value because of its relationship to the experts' opinions. The court's later statements regarding probative value provide further support for the change from the court's initial ruling.

Finally, even if we assume the court abused its discretion in admitting this evidence, Coronado does not argue he suffered any prejudice. Accordingly, admission of this evidence, standing alone, is not a basis for reversal.

**D.    The Court Did Not Abuse Its Discretion in Admitting Evidence of Incidents of Being Alone with Other Patients**

Coronado also contends the court abused its discretion in admitting evidence that he was counseled and written up for having private encounters with other patients. Although the court excluded evidence that expressly indicated the incidents involved sexual activity, Coronado argues the admitted evidence was unduly prejudicial because it allowed the jury to speculate that the incidents were sexual, particularly in light of Simon's stricken testimony. Coronado contends this evidence was unnecessary to rebut any impression raised by opening statements that his record was free of rule breaking, given the admission of evidence of minor misconduct described above. Finally, he contends this evidence, which was excluded from the prior trial that resulted in a mistrial, was highly prejudicial.

As Coronado acknowledges, the admitted exhibits documenting incidents in which he was alone with other patients do not include any references to sexual activity. As with the evidence of other minor acts of misconduct, evidence that Coronado was counseled and written up for incidents of being alone with other patients was probative of and relevant to Simon's diagnosis of a personality disorder. The evidence likewise was relevant to rebut the inference, raised by defense counsel's opening statement, that Coronado's record at the State Hospital was free of rules violations. Additionally, we cannot say the court abused its discretion in determining this evidence was more probative than prejudicial. The evidence that Coronado was counseled or written up for private contacts involving other adult patients is not the type of evidence that would evoke an emotional bias in the jury. Moreover, this evidence is trivial in comparison to the evidence of Coronado's charged and uncharged offenses. (*People v. Chhoun*, *supra*, 11 Cal.5th at p. 29.) The court did not abuse its discretion in admitting these exhibits or in altering its initial ruling to the contrary.

Nonetheless, Coronado argues the court abused its discretion in admitting this evidence because it allowed the People's experts to suggest Coronado was sexually exploiting more vulnerable patients. We note that the court expressly prohibited any testimony that would invite speculation or argument that Coronado had sex with anyone in the hospital. Although Simon testified Coronado was "seemingly" engaging in prohibited sexual activity, this testimony was stricken. Sidhu did not suggest these incidents were sexual. Rather, he testified there was no evidence of Coronado sexually abusing others in the State Hospital or prison.

However, the focus of Coronado's argument is Simon's testimony that Coronado was found alone with an offender with a mental disorder in a darkened room, that such offenders are considered more vulnerable to sexual exploitation by sexually violent predator patients, and that the incident was potentially clinically significant on that basis. Coronado's objections to this testimony were overruled and the court noted that Coronado's arguments regarding what might or might not be known about the other patient went to the weight of the evidence, rather than admissibility. Although we acknowledge Simon's testimony is close to the line drawn by the court regarding permissible and prohibited evidence, Simon stopped short of stating that Coronado had sexually exploited the other patient in this incident. Ultimately, the evidence was probative to show that Coronado had a current personality disorder and to Simon's assessment of Coronado's risk of reoffending.

Furthermore, while the probative value of this evidence was perhaps minimal considering the lack of testimony or other evidence that Coronado had engaged in any predatory or exploitative sexual behavior in the State Hospital, we cannot say the court abused its discretion in concluding its admission did not create a substantial danger of undue prejudice. The most damaging testimony presented to the jury related to Coronado's charged and uncharged offenses. In contrast, testimony that Coronado was alone with a potentially vulnerable adult was unlikely to evoke an emotional bias in the

44.

jury, particularly given that other testimony established there was no direct evidence of Coronado engaging in sex, let alone coercive sex, at the State Hospital.

Moreover, this testimony was unlikely to have a substantial effect on the issues. As stated, Simon diagnosed Coronado with pedophilic disorder. He testified that this is a lifelong disorder that does not go away and that Coronado's prior acts of sexual abuse and predatory conduct were the best indicators of his likelihood of committing a future sexually violent predator offense. Although Simon identified the incident with an offender with a mental disorder as concerning and clinically significant, he ultimately testified it was Coronado's charged and uncharged offenses, combined with the chronic nature of pedophilic disorder and other dynamic factors that put him at risk of reoffending. The challenged testimony appears to have been of marginal significance in Simon's assessment. Moreover, Sidhu did not rely on this incident at all in forming his opinions.

However, even if the court abused its discretion in admitting this testimony from Simon, the error was harmless. Again, Simon diagnosed Coronado with pedophilic disorder based on his charged and uncharged offenses, which reflected a decades-long pattern of "deviant sexual arousal to prepubescent children." Sidhu diagnosed Coronado with paraphilic disorder with pedophilic and hebephilic traits, also based on the behaviors reflected in his charged and uncharged offenses. Simon opined that Coronado continued to suffer from pedophilia at the time of trial because this is a diagnosis that does not go away. Sidhu opined that Coronado continued to suffer from paraphilic disorder because this is a chronic condition that cannot be mitigated without treatment, which Coronado had not participated in. Abrams fundamentally disagreed with these opinions and opined that Coronado's offenses were fueled by social factors and family dysfunction, rather than a mental disorder. Simon's testimony regarding the incident between Coronado and an offender with a mental disorder did not bear significantly on any of these opinions.

There is no reasonable possibility the jury would have reached a more favorable finding on this point in the absence of the error.

Additionally, both Simon and Sidhu opined that Coronado was likely to commit new predatory sexually violent offenses in the future. Their opinions were based on the Static-99R and their evaluation of dynamic risk factors. Because Coronado previously committed a predatory offense against P.F., both experts opined that any future offending was likely to be predatory. Although Simon identified the incident with a mentally disordered offender as relevant to his risk assessment, his testimony reflects he relied primarily on the Static-99R and dynamic factors. Meanwhile, Abrams disputed the reliability of the Static-99R and dynamic factors. Abrams opined that Coronado would stop offending once family member victims were no longer available to him. The incident with an offender with a mental disorder was not central to the experts' analysis. Nor did either party address this incident in closing argument. We therefore find no reasonable possibility the jury would have reached a more favorable finding on this point in the absence of the error.

Nor are we convinced that Coronado has demonstrated prejudice based on his prior trial resulting in a hung jury. As Coronado notes, evidence regarding his private interactions with other patients was not presented to the prior jury. Differences in the evidence presented to a prior hung jury may be relevant to a prejudice analysis. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 962 [considering whether error was harmless beyond a reasonable doubt in the penalty phase of a capital case, where mitigating evidence presented at the first trial but not at the second trial was the "main difference" between the two].) Indeed, in some cases, a prior hung jury may be one of many compelling factors in determining an error was prejudicial. (E.g., *People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1038–1043 [error in allowing the People to rely on an inflammatory "timeline" prepared by the victim that improperly bolstered the victim's credibility and that was not presented to a prior hung jury]; *People v. Diaz* (2014) 227

Cal.App.4th 362, 365, 382 [error to admit "highly inflammatory" videos, relied on at length during closing argument, where evidence presented to a prior hung jury was substantially similar, with the exception of the videos].)  In other cases, courts have declined to consider a prior hung jury in weighing prejudice.  (*People v. McDowell* (2012) 54 Cal.4th 395, 441 ["[T]he fact that the prosecutor did not make the challenged statements in the first penalty retrial, in which the jury could not reach a decision on punishment, does not establish prejudice."]; see *In re Richards* (2016) 63 Cal.4th 291, 313–315 [not considering effect of two prior hung juries in determining error was prejudicial]; accord, *id.* at p. 316 (conc. opn. of Corrigan, J.) ["To conclude that the case is weak merely because a jury, or even two, did not return a verdict is often an exercise in speculation."]; but see *id.* at p. 320 (conc. opn. of Liu, J.) [the challenged evidence presented a material difference between the two prior trials and the third trial, and the two prior hung juries were therefore relevant to the prejudice analysis].)

Here, Simon's challenged testimony was not the only difference between Coronado's prior trial and the current retrial.  Significantly, although P.F. testified in the prior trial, there was no testimony regarding his being a regional center client or having autism spectrum disorder or an intellectual disability.  Instead, he was described as being "emotionally immature."  Graff did not testify regarding P.F.'s history with Tri-Counties Regional Center or his behavioral age, and Tolley did not testify regarding the investigation of the offenses against P.F.  Nonetheless, the People's experts relied on the offenses against P.F. to opine that Coronado was likely to engage in predatory conduct in the future – a required element of finding he qualified as a sexually violent predator.  Meanwhile, in the prior trial, Abrams characterized the offense against P.F. as a "run of the mill gay arrest in a men's toilet," noting that P.F. was 17, "six-foot tall and obviously mature."  Simply stated, the evidence presented in the prior trial to suggest Coronado had engaged in predatory conduct against P.F. was far less compelling than that presented in the current trial.  This difference also is significant, given the prior jury's indication that

47.

redactions in the trial exhibits were the primary cause of their inability to reach a verdict. It appears large swaths of those redactions pertained to offenses other than those against A.A. In the current trial, however, Graff's testimony provided significant additional context regarding the offenses against P.F., and Tolley's testimony provided significant additional facts regarding the investigation of these offenses.

Unlike other cases that have relied on a prior hung jury to find prejudice, the prior hung jury in this case allows for only speculative inferences regarding the potential impact of the challenged testimony of the jury. As stated, the challenged testimony regarding Coronado being alone with an offender with a mental disorder was not the only difference, let alone the most material difference, between the prior trial and the current retrial. (Cf. *People v. Gonzalez*, *supra*, 38 Cal.4th at p. 962 [main difference between prior hung jury and subsequent retrial was the presentation of mitigating evidence]; *People v. Kelley* (1967) 66 Cal.2d 232, 245 [first trial and retrial were substantially similar, with the exception of erroneously admitted other crimes evidence], abrogated in nonrelevant part by Evid. Code, § 1108; *People v. Diaz*, *supra*, 227 Cal.App.4th at pp. 381–382, 385 [prior trial and retrial involved similar evidence, with the exception of erroneously admitted and highly inflammatory videos].) Nor was the challenged testimony the only evidence on a fact of consequence (*People v. Linder* (1971) 5 Cal.3d 342, 347–348 [erroneous exclusion in retrial of the testimony from the only witness who could corroborate the defendant's alibi was prejudicial]), or highly inflammatory (*People v. Kelley*, at p. 238; *People v. Diaz*, at p. 382). Coronado has not shown he would have achieved a more favorable result in the absence of the challenged testimony.

Accordingly, while we conclude the court did not abuse its discretion in admitting Simon's testimony regarding Coronado being alone with an offender with a mental disorder, we conclude that any error in admitting the evidence was harmless.

## II.    Motion for Mistrial

Coronado contends the trial court prejudicially erred in denying his motion for mistrial based on Simon's reference to Coronado engaging in sexual activity with other patients at the State Hospital. We conclude the court did not abuse its discretion in denying the motion.

### A.    Additional Background

We reiterate the circumstances surrounding this testimony: Simon was questioned regarding his belief that Coronado continued to suffer from a mental disorder. In that context, he stated, "[I]t has been concerning to me that there were some incidents at the State Hospital where [Coronado] was seemingly engaging in sexual activity with other patients in a way that was not allowed." Defense counsel objected and the objection was sustained. Defense counsel's motion to strike was granted. Counsel did not request a jury admonition regarding the testimony.

Defense counsel revisited this issue during a later break in testimony, arguing that testimony regarding "Coronado having sex with another patient in the State Hospital" was contrary to the court's rulings on motions in limine. Counsel moved for a mistrial and alternatively asked that the witness be admonished as to the court's evidentiary rulings.

The court agreed that it had excluded testimony suggesting Coronado had sex with other patients, given the lack of evidence on that point. However, the court found the testimony was not intentionally elicited by the prosecutor, nor was the court's ruling intentionally violated. The court noted defense counsel's objection was sustained and the testimony was stricken, which the court viewed as sufficient to remedy any issues arising from the testimony. The court offered to admonish the jury that "there is no such evidence and direct them to disregard any . . . testimony to the contrary." The court acknowledged, however, that defense counsel may not wish to draw further attention to the matter. The court also stated it would clarify the ruling for Simon and that it would

49.

not allow any testimony on this subject. Defense counsel did not request any admonition regarding the testimony.

The jury instructions provided, in relevant part as follows:

"During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. . . . If I ordered the testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."

## B.     Applicable Law

We review a ruling on a motion for mistrial for abuse of discretion. (*People v. Schultz* (2020) 10 Cal.5th 623, 673.) " '[A] trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . .' " (*Ibid.*) " ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction." ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 703.) " ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*Schultz*, at p. 673; see *People v. Bell* (2019) 7 Cal.5th 70, 121.)

" 'Although most cases involve prosecutorial or juror misconduct as the basis for the motion [for mistrial], a witness's volunteered statement can also provide the basis for a finding of incurable prejudice.' " (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.)

## C.     Analysis

Coronado contends the court improperly focused on the prosecutor's degree of fault in eliciting Simon's testimony, rather than the testimony's effect on the jury. He further states he is "skeptical" of the court's determination that the prosecutor did not intentionally elicit the testimony in violation of the court's ruling, and, in any event, the prosecutor was obligated to advise Simon to avoid testimony on Coronado's sexual activity while in the State Hospital. He additionally asserts Simon offered the testimony in bad faith with the intent to prejudice him. Finally, he contends the testimony was very

50.

prejudicial in the context of the entire case, and the prejudice was not cured by the court's instruction. He therefore contends the inadmissible testimony made it impossible for him to obtain a fair trial and the motion should have been granted. We reject each of these contentions.

### i.     Bad Faith on the Part of the Prosecutor and Witness

Although bad faith is not required for the court to declare a mistrial, it can be grounds for a mistrial. (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 831, 835–837; *People v. Bentley* (1955) 131 Cal.App.2d 687, 690 (*Bentley*), disapproved on another ground in *People v. White* (1958) 50 Cal.2d 428, 431.)[9] In such cases, the misconduct reflects a prosecutor's or witness's intent to prejudice the jury. (*People v. Navarrete*, at p. 836.) "Bad faith is manifested by an attorney asking questions which he knows to be inadmissible and improper, or where the question asked was for the clear purpose of prejudicing the jury against the defendant." (*People v. Dorsey* (1974) 43 Cal.App.3d 953, 964.)

We reject Coronado's contentions that Simon and the prosecutor offered the challenged testimony in bad faith. The court found that the prosecutor did not intentionally solicit this testimony nor intentionally violate the motion in limine. This finding is supported by the record. The prosecutor asked Simon, "In your review of the records, did you come across any information that would concern you or show behavior that tends to show he continues to have *these mental disorders*?" (Italics added.) Simon answered affirmatively and the prosecutor asked him to explain. Simon then began a

---

[9] We cite to *Bentley* because the case is relied on by Coronado. However, *Bentley* was not decided under an abuse of discretion standard and several principles articulated therein have since been abrogated. (See, e.g., Evid. Code, § 1108 [permitting evidence of prior sexual acts]; see also *People v. Cowan* (2010) 50 Cal.4th 401, 479 [court has no obligation to give a limiting instruction on its own motion]; *People v. White, supra*, 50 Cal.2d at p. 431 [same].) We discuss *Bentley* further below, but its substantial abrogation and reliance on bad faith renders it of limited utility in our analysis.

51.

lengthy and somewhat narrative response regarding Coronado's rules violations, personality disorder, lack of pedophilic behavior in custody, and pedophilic disorder, before veering into the prohibited testimony. Nothing about the question or response suggests the challenged testimony was anticipated by the prosecutor. Subsequently, the prosecutor asked a similar question: "[H]ow do you know then that your diagnosis remains current?" Simon answered that pedophilic disorder does not go away or stop. He did not again reference the prohibited matter of Coronado's sexual contact with other patients.

Coronado suggests Simon was a loose cannon who "might try to slip in inadmissible testimony." This assertion is based on the following exchange between Simon and the prosecutor in Coronado's 2023 trial:

"Q.     And in your opinion, is it likely to be predatory if Mr. Coronado re-offends?

"A.     Yes.

"Q.     Why?

"A.     Well, a number of reasons. He already has shown that he's not just solely an intrafamilial offender. He has offended against the victim -- I think you said his name was P[.]. The one from 1998 in the bathroom –

"Q.     P[.]?

"A.     -- that was a stranger.

"Theres other data points that lead me to conclude that that I'm not allowed to talk about, but --

"[DEFENSE COUNSEL]: Objection.

"THE WITNESS:     -- do go into my thinking.

"THE COURT:      Hold on just one moment, Doctor.

"[DEFENSE COUNSEL]: He said -- may we approach?

"THE COURT: Folks, the comment along the line of other data points that the doctor's not allowed to mention is stricken. That's to be disregarded. That has no evidentiary value.

"Doctor, if it's something you feel you're not allowed to mention, just let it go unmentioned altogether."[10]

We disagree that this exchange reflects that Simon would try to purposefully testify to inadmissible matters with the intent of prejudicing Coronado. Rather, it reflects Simon's awareness that he was *not* permitted to testify on prohibited matters, even if those matters influenced his opinion. Ultimately, Simon *did not* testify to the prohibited material in the prior trial[11] and there was no contention at the time that he intentionally violated the court's order. Although Simon's statement regarding matters he could not testify to was improper and ill advised, we are unwilling to conclude at this distance that it was made in bad faith, or that it permits an inference that his testimony in Coronado's 2024 retrial was made in bad faith.

Finally, Coronado contends the prosecutor is "to blame" for Simon's mistake because she "negligently elicit[ed] the evidence" and should have "carefully advise[d]" Simon that evidence of Coronado's sexual contact was inadmissible.[12] While we agree the prosecutor should have advised her witness of the evidence ruled inadmissible by the court, we reiterate that the prosecutor's question did not appear designed to elicit a

---

[10] Coronado unsuccessfully moved for a mistrial based on this testimony as well. Simon was present during argument on the motion and asked to "chime in," a request which the court declined. The court noted it had advised Simon "to not mention the unmentionables going forward" and stated it was "not ascribing any bad faith to the witness."

[11] Because Simon never clarified what subject he was prohibited from testifying to, there is no basis in the record for Coronado's contention that the inadmissible evidence in the prior trial is likely the same evidence Simon testified to in the retrial.

[12] Somewhat paradoxically, Coronado argues both that the prosecutor was at fault for eliciting the testimony, and that the court should not have evaluated the motion based on the prosecutor's degree of fault.

response regarding inadmissible evidence. Furthermore, regardless of Coronado's speculative contentions regarding the prosecutor's intent, he is correct that the ultimate inquiry before the court was whether the testimony was incurably prejudicial, a question we address below.

### ii. The Court Understood and Applied the Relevant Law

Coronado contends the court should have granted the motion for mistrial based on the effect of the inadmissible evidence on the jury, rather than focusing on the prosecutor's degree of fault. To the extent Coronado suggests the court abused its discretion because it did not understand and apply the applicable law, we disagree.

As explained above, bad faith on the part of the prosecutor may be considered in determining whether to grant a mistrial. It was not improper for the court to consider the prosecutor's intent in determining whether the motion should be granted.

Significantly, the court determined that sustaining defense counsel's objection and striking the testimony was sufficient to remedy the issue and offered to admonish the jury at defense counsel's request. Although the court did not directly reference the incurable prejudice standard, it is clear the court understood its obligation to consider the prejudicial effect of the testimony on the jury and whether it could be cured by admonition or instruction.

### iii. The Court Did Not Abuse Its Discretion in Denying the Motion

Simon's testimony regarding Coronado's sexual encounters was brief, fleeting, and immediately stricken. Brief, isolated, and ambiguous references to inadmissible evidence have been held not to cause incurable prejudice. (*People v. Valdez* (2004) 32 Cal.4th 73, 128 [in the absence of prosecutorial misconduct, brief and isolated reference to inadmissible evidence did not irreparably damage the defendant's chances of receiving a fair trial]; *People v. Bolden* (2002) 29 Cal.4th 515, 555 [fleeting reference to inadmissible evidence would not lead the jury to make impermissible inferences and was not significant in the context of the entire trial]; *People v. Kocontes* (2022) 86

54.

Cal.App.5th 787, 859–860 [brief, isolated reference to " 'parents' " did not incurably prejudice the defendant by suggesting a prior incident involved a minor, and brief, ambiguous statement that the defendant had been incarcerated and "had 'connections with people who could take care of' " someone would not cause the jury to conclude the defendant had been incarcerated for a particular incident or that he had a propensity to commit murder].)

Additionally, Simon was not permitted to elaborate further regarding Coronado's sexual activities, and it is unclear how his testimony that Coronado was "seemingly engaging in sexual activity with other patients in a way that was not allowed" related to his opinion that Coronado continued to have a mental disorder.  Coronado suggests the jury would have concluded from this testimony that he "could not stop having illicit sex." He further contends that this testimony, combined with Simon's testimony that Coronado was in a room alone with an offender with a mental disorder and that such offenders are more vulnerable to sexual exploitation, implied to the jury that he was "intimidating mentally disabled persons into having sex against their will."  However, these conclusions require several inferential leaps from the ambiguous statement that Coronado was "seemingly engaging in sexual activity with other patients in a way that was not allowed."  (See *People v. Wharton* (1991) 53 Cal.3d 522, 566 [improper testimony that requires further inferences to implicate the defendant is not incurably prejudicial].) Indeed, Coronado concedes neither party directly argued to the jury that Coronado has had sex with anyone at the State Hospital.

In any event, the jury ultimately was instructed to disregard stricken testimony and to not consider it for any purpose.  "When the trial court instructs the jury to disregard improper testimony, we review for abuse of discretion the trial court's reliance on a curative instruction in place of declaring a mistrial."  (*People v. Turner* (2021) 73 Cal.App.5th 117, 127 (*Turner*).)  "It has long been the rule that a reviewing court presumes the jury follows an instruction to consider only the evidence pertinent to a

charged crime and to disregard evidence that was admitted improperly. [Citations.] The presumption that jurors follow instructions has been described in this regard as ' "[t]he crucial assumption underlying our constitutional system of trial by jury." ' " (*Id.* at p. 128.) "Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured." (*People v. Martin* (1983) 150 Cal.App.3d 148, 163.) We therefore presume the jury followed the court's instruction. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

We acknowledge that an instruction or admonition may be inadequate to cure prejudice in " 'exceptional circumstances.' " (*Turner*, *supra*, 73 Cal.App.5th at p. 128.) "The finding of exceptional circumstances depends upon the facts in each case." (*People v. Allen* (1978) 77 Cal.App.3d 924, 935 (*Allen*).) Coronado cites several cases that present exceptional circumstances of incurable prejudice that he contends support a similar finding in this case. We review the cases cited by Coronado and conclude each is distinguishable.

In *Turner*, the defendant faced a consolidated trial on two unrelated murder charges. At the close of evidence, the trial court granted his motion to sever the two charges on the ground the evidence supporting one of the murders was weak. The defendant unsuccessfully sought a mistrial in the stronger of the two cases, which was denied. (*Turner*, *supra*, 73 Cal.App.5th at p. 120.) The court specified the pertinent evidence, instructed the jury to disregard all evidence of the unrelated case, and obtained a show of hands and assurance that each juror would do so. (*Id.* at p. 128.) However, the appellate court held the trial court abused its discretion in denying the motion for mistrial. (*Id.* at p. 120.) The appellate court noted it was proper to accord some weight to the jurors' assurances they would disregard the evidence but ultimately determined the court's admonition was inadequate under the " 'exceptional circumstances' " of the case.

(*Id.* at p. 128; see *id.* at p. 129.) The court noted the evidence of the unrelated murder was neither fleeting nor ambiguous and instead involved graphic details of the victim's injuries and descriptions of the "shocking and unprovoked" manner in which the crime was committed. The jury also heard details of a jailhouse attack on a witness to the unrelated murder, which the defendant admitted to. (*Id.* at p. 129.) In these circumstances, the court held it was "an abuse of discretion to rely on the admonition as sufficient to cure the prejudice from admission of evidence of the [unrelated] murder." (*Ibid.*)

Turner is so readily distinguishable from the instant case that it can have virtually no bearing on our analysis. Coronado concedes the evidence in this case was less "significant" than that at issue in *Turner*. However, he fails to acknowledge that the jury in *Turner* heard an entire trial's worth of graphic evidence on an unrelated murder charge. In the instant case, the jury heard only a brief, isolated statement that was immediately stricken. Coronado also points out that, unlike in *Turner*, the court here did not obtain assurances from the jurors that they could disregard the stricken testimony. However, the jurors' assurances in *Turner* were insufficient to show the prejudice had been cured, given the nature and extent of the evidence concerning the unrelated murder. (*Turner*, *supra*, 73 Cal.App.5th at p. 130.) There is simply no comparison between the improper evidence in *Turner* and that presented here.

In *Bentley*, *supra*, 131 Cal.App.2d at page 688, the defendant was convicted of committing a lewd act upon a child. A police officer testified that, in addition to questioning the defendant regarding the charged offense, he also questioned the defendant regarding a prior offense in which he was a suspect. The officer's testimony was stricken and the jury admonished to disregard it. The defendant's motion for mistrial was denied. (*Id.* at p. 689.) Thereafter, another witness testified that the defendant's reputation for morality was bad and, when asked whether she had discussed his morality with others, she stated he had tried " 'to date up all the married women in the

57.

neighborhood.' " (*Id.* at pp. 689–690.) The defendant requested the answer be stricken and the jury admonished. Without ruling on the motion, the court interrogated the witness and brought out that she had not discussed the defendant's character or reputation with others. (*Id.* at p. 690.) The appellate court ruled that these two statements together were prejudicial and required reversal. The court noted there were weaknesses in the testimony of the prosecuting witness and the police officer's challenged testimony was intended to deliberately prejudice the defendant. (*Ibid.*) Moreover, the testimony regarding a separate offense was highly prejudicial: "The mere direction that the testimony should be disregarded was no antidote for the poison that had been injected into the minds of the jurors. The defendant stood as one who had been accused of some other sex offense." (*Ibid.*) Ultimately, the court concluded it could not say the complained of statements "did not result in a miscarriage of justice." (*Id.* at p. 692.)

We have rejected Coronado's argument that Simon and the prosecutor acted in bad faith and *Bentley* is distinguishable on that basis. Additionally, the law has changed in several relevant respects since *Bentley* was decided (see *ante*, fn. 9), further limiting the utility of this case. Moreover, the prejudice in *Bentley* arose from two instances of improper testimony: improper other crimes evidence (which now would seemingly be admissible under Evid. Code, § 1108) and improper character evidence. In contrast, the testimony at issue here was made up of a single, isolated reference that appears to have been made in good faith. Based on these distinctions, *Bentley* does not convince us that this is an exceptional case of incurable prejudice.

In *Allen*, *supra*, 77 Cal.App.3d at page 927, the defendant was convicted of robbery. The trial court improperly restricted the defendant's lawyer from cross-examining his coparticipant and his coparticipant's mother on matters suggesting the coparticipant was biased or had a motive to fabricate his testimony. (*Id.* at pp. 931–934.) Additionally, the trial court denied a motion for mistrial after the coparticipant's mother testified in the prosecution's rebuttal that the defendant was on parole. (*Id.* at p. 929.)

Although the trial court struck the testimony and admonished the jury to disregard it, the appellate court held this was insufficient to cure the substantial danger of undue prejudice and misleading the jury arising from the testimony. (*Id.* at pp. 934–935.) The appellate court noted this was an "exceptional case" in which the effect of the improper testimony could not be removed by an admonition because it was an incredibly close case that turned on the credibility of the witnesses and it therefore was reasonably probable the defendant would have obtained a more favorable result had his parole status not been divulged. (*Id.* at p. 935.) Together, the errors were prejudicial: "Had the [defendant] been able to present evidence as to the motive of fabrication and the jury not heard the damaging evidence about [the defendant's] parole status, it is reasonably probable that a result more favorable to the [defendant] would have been reached. Under such circumstances a reversal is mandated." (*Id.* at p. 939.)

As in *Bentley*, the court's holding in *Allen* was based on prejudice arising from two distinct errors. Moreover, both errors affected witness credibility, an issue central to resolving the case. In contrast, here, the single reference to inadmissible evidence was not central to the case and only ambiguously related to the ultimate issue of whether Coronado had a diagnosed mental disorder that makes it likely he will engage in sexually violent criminal behavior. (§ 6600, subd. (a)(1).) Nonetheless, Coronado argues that, like *Allen*, this was a very close case, as indicated by the prior hung jury, thus increasing the potential for prejudice from the inadmissible evidence. To the extent Coronado's case was close, it turned on the credibility of the parties' respective expert opinions, which diverged in significant respects unrelated to whether Coronado was engaging in sexual activity with other patients. We therefore disagree the testimony was incurably prejudicial on this basis.

Finally, in *People v. Schiers* (1971) 19 Cal.App.3d 102, 104 (*Schiers*), the defendant was convicted of the second degree murder of his wife. An officer improperly testified that the defendant was given a lie detector test and told that the test indicated he

59.

was lying when asked questions about the murder. (*Id.* at p. 108.) After a recess, defense counsel stated he had no recollection of the testimony but would have objected to it had he been aware of it. (*Ibid.*) The trial court granted a motion to strike the testimony and admonished the jury not to consider it. (*Ibid.*) However, the appellate court determined the error was incapable of being cured by admonition. The court adopted the reasoning of the dissent in the defendant's prior case (*id.* at p. 114), which would have held that the error in introducing lie detector testimony was deliberately committed (*id.* at p. 112; see *People v. Schiers* (1958) 160 Cal.App.2d 364, 379–380 (dis. opn. of Carter, J.)). The dissent further would have held the prejudice of the error was compounded by the " 'prestige' " and " 'glamour' " of the lie detector instrument, and the lack of any expert testimony regarding the accuracy of the instrument or other indicia of reliability. (*Schiers*, *supra*, 19 Cal.App.3d at p. 112.)

Coronado does not explain how *Schiers* is relevant to his argument. *Schiers* was not decided under an abuse of discretion standard (*Schiers*, *supra*, 19 Cal.App.3d at p. 109), and the analysis relied heavily on case law specific to the prejudice arising from lie detector tests (*id.* at pp. 108–112). As in *Bentley*, the inadmissible testimony was presented in bad faith. *Schiers* does not advance Coronado's argument that this is an exceptional case of incurable prejudice.

In sum, the court did not abuse its discretion in denying the motion for mistrial because Simon's brief reference to Coronado "seemingly engaging in sexual activity with other patients in a way that was not allowed" was not incurably prejudicial.

## III.     Exclusion of Evidence of Sex Offender Registration Requirement

Coronado contends the court erroneously excluded evidence that he would be required to register as a sex offender if released. He contends this evidence was relevant to show it is less likely he would commit a sexually violent and predatory offense in the future. The People contend the court did not abuse its discretion in excluding this

evidence and, in any event, Coronado cannot show prejudice. Coronado concedes this error is not independently prejudicial but contends it contributed to the cumulative prejudice resulting from all the court's errors. We conclude the court did not err in excluding the evidence.

### A.     Additional Background

The People moved in limine to prohibit testimony about the conditions of parole Coronado would face if released.[13]  Both parties indicated they did not intend to introduce such evidence, and the court stated it was disinclined to allow inquiry into Coronado's postrelease status. However, defense counsel noted the People's motion also sought to prohibit evidence that Coronado would be subject to sex offender registration (Pen. Code, § 290). The prosecutor argued evidence that Coronado was required to register as a sex offender was prohibited by *People v. Krah* (2003) 114 Cal.App.4th 534 (*Krah*), because it was not relevant to whether Coronado had a mental disorder that predisposes him to commit sexually violent predatory crimes. Defense counsel asserted he wished to question the experts as to whether registration would constitute a protective factor that could prevent Coronado from reoffending. The court stated it understood *Krah* to prohibit evidence of "external conditions or requirements," such as registration pursuant to Penal Code section 290, that are likely to confuse the jury and do not bear on whether Coronado has a qualifying mental disorder. Accordingly, the court excluded evidence of Coronado's sex offender registration requirement.

---

[13] The admissibility of this evidence was addressed during motions in limine in Coronado's 2023 trial, which resulted in a hung jury. Prior to his 2024 retrial, the parties agreed that, except as otherwise noted, the court's prior rulings would apply. The parties agree the court issued no subsequent rulings regarding this evidence.

### B.     Applicable Law

The extent to which postrelease conditions or requirements are relevant in sexually violent predator proceedings has been addressed in a series of cases.  We review the relevant case law.

*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888 (*Ghilotti*) addressed the admissibility, in sexually violent predator recommitment proceedings,[14] of a patient's amenability to treatment.  There, Ghilotti was adjudicated a sexually violent predator but evaluators subsequently concluded he no longer met the statutory criteria for commitment.  (*Ghilotti*, at pp. 893–894.)  When the District Attorney nonetheless petitioned for recommitment, the superior court dismissed the petition and ordered Ghilotti's unconditional release.  (*Id.* at p. 894.)  The People sought mandamus relief, which was summarily denied by the Court of Appeal.  (*Ibid.*)  On review, the California Supreme Court addressed several issues of first impression relating to recommitment procedure.  (*Id.* at pp. 894–895.)  Relevant here, the high court considered the commitment criterion requiring an assessment of whether the person " 'is likely to engage in acts of sexual violence *without appropriate treatment and custody*,' " and whether this criterion permitted an evaluator to "consider, as a factor reducing the likelihood of reoffense, the chances that a person who is substantially dangerous if untreated will voluntarily accept community treatment to ameliorate the substantial danger."  (*Id.* at pp. 924–925.)  The high court concluded that the evaluation protocol "appears to allow consideration whether the [diagnosed mental] disorder, though dangerous if untreated, is of a kind and extent that can be effectively treated in the

---

[14] At the time, sexually violent predator commitment was for a two-year term, with subsequent commitments requiring a recommitment petition.  (*Ghilotti, supra*, 27 Cal.4th at p. 905; see former § 6604; Sen. Bill No. 2018 (1999–2000 Reg. Sess.).)  Now, sexually violent predator commitment is for an indefinite term (§ 6604), and the committed person's mental condition must be examined annually to determine whether he or she continues to meet the definition of a sexually violent predator (§ 6604.9, subds. (a), (b).)

community, and whether the disorder leaves the person willing and able to pursue such treatment voluntarily." (*Id.* at p. 927.)

*Krah*, *supra*, 114 Cal.App.4th 534 considered the admissibility of evidence of the terms and conditions of parole that would be imposed if a potential sexually violent predator was released. There, Krah was adjudicated a sexually violent predator and committed to DSH. (*Id.* at p. 539.) On appeal, he relied on *Ghilotti* to argue the trial court reversibly erred "by excluding evidence of the terms and conditions of parole that would have been imposed on him if he were released from custody."[15] (*Krah*, at pp. 544, 545.) He asserted " '[c]ommon sense suggests that the terms and conditions by which [he] will have to abide when he is on parole will affect the likelihood that he will engage in the commission of sexual criminal acts.' " (*Id*. at p. 544.) The Court of Appeal disagreed, holding that "[e]vidence of the terms and conditions of a parole release is simply not relevant to the determination whether the defendant has the type of medical condition that is an element of the definition of a sexually violent predator." (*Ibid*.) The court distinguished *Ghilotti*, explaining: "*Ghilotti* reinforces our conclusion that the relevant inquiry is whether the defendant's mental condition makes it likely he will reoffend. Evidence that the defendant's condition does not preclude him from voluntarily pursuing treatment if unconditionally released would be relevant under this test. [Citation.] However, evidence that the defendant would be *required* to comply with terms and conditions of parole would not be relevant. Such evidence has no bearing on the determination whether the defendant has a disorder which makes it likely he will reoffend; it does not relate to the nature of the defendant's disorder or reflect in any way his willingness or ability to pursue treatment voluntarily." (*Id.* at p. 546.)

---

[15] The specific terms and conditions at issue were not described in the *Krah* opinion. (*Krah*, *supra*, 114 Cal.App.4th at pp. 544–546.)

*People v. Shazier* (2014) 60 Cal.4th 109 (*Shazier*) addressed the admissibility of evidence that a person would *not* be on parole if released. Following a jury trial, Shazier was adjudicated a sexually violent predator. (*Id.* at p. 125.) During the trial, "[b]oth the prosecution and defense devoted significant attention to [Shazier's] postrelease plans, including his proposed living arrangements and his strategies for avoiding new offenses." (*Id.* at p. 128.) The prosecutor "briefly asked about the proximity of his [proposed residence] to 'any schools or playgrounds.' " (*Ibid.*) During both direct and cross-examination, Shazier testified regarding the proximity of his proposed residence to schools, parks, and other locations, and how he would "deal with the proximity of these locations" through learned strategies and techniques. (*Ibid.*) During closing argument, the prosecutor noted Shazier would not be on parole if released. (*Id.* at p. 129.) On appeal, the court held the prosecutor committed misconduct by questioning Shazier regarding the proximity of the proposed residence to schools and by noting that Shazier would not be on parole if released. The appellate court characterized these comments as "forbidden references" (*id.* at p. 125) to the " 'consequences' " of the jury's verdict (*id.* at p. 129).

Our Supreme Court disagreed. (*Shazier*, *supra*, 60 Cal.4th at p. 128.) The high court explained that the question of "whether a mentally disordered sex offender's release into the community might lead to his or her commission of new violent predatory sex offenses" was "a critical and essential subject for the jury's consideration." (*Id.* at p. 129.) The prosecutor's questions and comments were intended to address whether "the conditions under which [Shazier] would live if not securely confined as [a sexually violent predator] would contribute to the degree of likelihood that he would reoffend." (*Id.* at p. 130.) The high court rejected Shazier's contention that the only pertinent issue was "whether he was willing to undergo voluntary treatment in the community for his disorder, if any, and whether the disorder was of a kind and degree that was amenable to voluntary community treatment," a factor unaffected by the proximity of his residence to

schools and parks. (*Id.* at p. 130.) Instead, the high court reasoned the prosecution was permitted to support its argument that Shazier had an urgent and incurable "mentally disordered compulsion" to engage in sexually violent predatory offenses whenever he was free of secure confinement with evidence that he would lack supervision and live in conditions affording him an opportunity to reoffend. (*Ibid.*; see *id.* at p. 131.) The high court ruled that evidence an offender will be " 'without any conditions, supervision, monitoring, or mandatory treatment' " is relevant to the fact finder's ultimate inquiry, as is evidence that the circumstances of release may afford "a particular opportunity to re-engage in the pattern of conduct that marks the disorder." (*Id.* at p. 132.)

The high court further concluded that *Krah* did not require a contrary result. The high court explained:

> "Thus, in *Krah*, the appellate court rejected [a sexually violent predator] defendant's attempt to show that, even if the nature and extent of his sexually dangerous mental disorder made him likely to reoffend if free in the community without supervision or conditions, he nonetheless need not be confined because parole monitoring would hold him safely in check. In other words, the defendant sought, by proffering evidence of parole, to persuade his jury he should be released for reasons extraneous to his status as [a sexually violent predator].

> "Here, by contrast, the prosecution simply sought to convey the logical inference that if the nature and extent of [the] defendant's diagnosed mental disorder compelled him to commit multiple sex offenses of a particular kind even when supervised on parole, under conditions specifically intended to forestall such misconduct, a fortiori, that disorder made it likely he would reoffend if free in the community 'without any conditions, supervision, monitoring, or mandatory treatment.' [Citation.] We find in this approach *no improper effort* to persuade the jury that [the] defendant should be kept in secure confinement *for reasons extraneous to his status* as [a sexually violent predator]." (*Shazier*, *supra*, 60 Cal.4th at p. 133, italics added.)

In summary, *Krah* provides that *required* parole conditions are irrelevant and extraneous to the question of whether a diagnosed mental disorder makes the person likely to engage in sexually violent criminal behavior. (*Krah*, *supra*, 114 Cal.App.4th at

p. 546; accord, *Shazier*, *supra*, 60 Cal.4th at p. 133.) *Shazier* provides that the *absence* of required parole conditions may be relevant to show that a person is likely to engage in sexually violent criminal behavior, particularly where the person previously has been unable to refrain from such behavior even while subject to the conditions of parole. (*Shazier*, at p. 133.) And, finally, *Ghilotti* provides that amenability to voluntary treatment may be relevant to show a person is unlikely to engage in sexually violent criminal behavior, because such person "has more motivation, ability and opportunity to function lawfully if free in the community despite his mental impairment." (*People v. Calderon* (2004) 124 Cal.App.4th 80, 89; accord, *Ghilotti*, *supra*, 27 Cal.4th at p. 927.)

### C.     Analysis

Coronado first argues *Krah* was wrongly decided because "[t]he effectiveness of the policing function is self-evidently relevant to whether [a sexually violent predator] defendant would be likely to commit a sexually violent and predatory offense in the future." However, even assuming *Krah* is correct, he contends its holding does not extend to sex offender registration. We disagree on both points.

As stated, the ultimate question under the Sexually Violent Predators Act is whether an offender has a diagnosed mental disorder that makes it likely that he or she would engage in sexually violent criminal behavior if released in the community " 'without any conditions, supervision, monitoring, or mandatory treatment.' " (*Shazier*, *supra*, 60 Cal.4th at p. 132.) Our Supreme Court has confirmed it is improper to consider matters extraneous to this ultimate inquiry. (*Id.* at p. 133.) Thus, amenability to treatment is a proper consideration because it may reflect that the offender can voluntarily ameliorate the risks of his mental disorder while free in the community. (*People v. Calderon*, *supra*, 124 Cal.App.4th at p. 89.) Prior poor performance on parole is a proper consideration because it may reflect that the offender *cannot* voluntarily ameliorate the risks of his mental disorder if free in the community, with or without

conditions. (*Shazier*, *supra*, 60 Cal.4th at p. 133.) However, external enforcement mechanisms such as sex offender registration or parole conditions do not bear on whether the offender can voluntarily ameliorate the risks of his mental disorder and thus do not bear on whether his disorder is such that he is likely to engage in sexually violent criminal behavior if released without conditions. (*Krah*, *supra*, 114 Cal.App.4th at p. 546.) In other words, permissible considerations relate to the nature of the offender, his or her mental disorder, and the risks inherent therein. Registration and supervision requirements are unrelated to the nature of the offender, his or her mental disorder, or the risks inherent therein and are therefore impermissible considerations. As the foregoing makes clear, *Krah* is consistent with the framework set out by our Supreme Court in *Ghilotti* and *Shazier*.

Although Coronado contends *Shazier* misinterpreted *Ghilotti* in crafting this framework, we are bound by the rulings of our high court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) *Shazier* interprets *Ghilotti* to mean that the ultimate inquiry is whether the offender presents a danger of reoffending if released without conditions (*Shazier*, *supra*, 60 Cal.4th at p. 132), and we have no power to reconsider this determination (*Auto Equity Sales, Inc. v. Superior Court*, at p. 455). Coronado also argues that *Shazier* does not stand for the proposition that *Krah* was properly decided. We disagree. *Shazier* interpreted *Krah* as prohibiting consideration of evidence extraneous to the offender's status as a sexually violent predator, then went on to state that reliance on such extraneous factors would be improper. (*Shazier*, *supra*, 60 Cal.4th at pp. 132–133.)

Coronado also relies on *People v. Putney* (2016) 1 Cal.App.5th 1058, as support for his argument that *Krah* was wrongly decided. During the pendency of a sexually violent predator petition, Putney was sentenced to a term of 25 years to life for an intervening offense. (*Id.* at p. 1062.) Nevertheless, a jury found him to be a sexually violent predator and the court issued an order recommitting him. (*Ibid.*) The Court of

Appeal held the trial court acted in excess of its jurisdiction by entering the recommitment order after the intervening sentence became final. (*Id.* at pp. 1066, 1068.) This holding was based on several rationale. Relevant here, the court held that, as a matter of law, "an offender who has no prospect of being released from custody for many years does *not* meet the definition of [a sexually violent predator] since the offender poses no danger to the public." (*Id.* at pp. 1068–1069.) The court determined the Sexually Violent Predators Act "does not contemplate the commitment of people . . . who pose no danger to the public because they have long prison terms left to serve." (*Putney*, at p. 1069.)

In addition, the court determined that commitment of persons serving lengthy prison terms is inconsistent with provisions of the Sexually Violent Predators Act that govern conditional and unconditional release, because there is no possibility of such persons being conditionally or unconditionally released from custody pursuant to the Sexually Violent Predators Act while having a prison term left to serve. (*People v. Putney, supra*, 1 Cal.App.5th at pp. 1069–1070; see §§ 6604.9, 6605, 6608.) The court also found it of little significance that the statute did not expressly provide for dismissal of sexually violent predator petitions relating to offenders facing lengthy remaining sentences. In this regard, the court noted the purpose of the Sexually Violent Predators Act was protection of the public, and there was no expressed intent to civilly commit offenders facing long prison sentences. (*Putney*, at p. 1070.) The court further determined that Sexually Violent Predators Act proceedings are unnecessary to ensure that sexually violent predators receive mental health treatment while incarcerated. (*Putney*, at p. 1071.) Ultimately, the court determined that adjudicating Putney's petition was pointless, served no practical purpose, and resolved only "the theoretical question of whether Putney was too dangerous for an imminent release he had virtually no possibility of obtaining." (*Ibid*.)

Coronado contends *Putney* supports an inference that *Krah* is wrongly decided because the court considered external factors – the offender's incarceration – in determining he did not meet the definition of a sexually violent predator. However, *Putney* is inapposite. Again, a sexually violent predator is one who is likely to engage in sexually violent criminal behavior " 'if *free in the community* without any conditions, supervision, monitoring, or mandatory treatment.' " (*Shazier*, *supra*, 60 Cal.4th at p. 132, italics added, italics omitted; see § 6600, subd. (a)(1).) Because Putney could not be free in the community, he could pose no such danger. The court's determination that the court lacked jurisdiction to adjudicate a sexually violent predator who posed no such risk is distinct from the risk-assessment issue presented in *Ghilotti*, *Krah* and *Shazier*. *Putney* therefore does not convince us *Krah* was wrongly decided.

Based on the foregoing, we reject Coronado's contention that *Krah* was wrongly decided. Because Coronado's sex offender registration status is extraneous to his status as a sexually violent predator, it was irrelevant to the ultimate question before the jury, and the court did not err in excluding this evidence. (*Krah*, *supra*, 114 Cal.App.4th at p. 546; accord, *Shazier*, *supra*, 60 Cal.4th at p. 133.) The distinctions between sex offender registration requirements and parole conditions cited by Coronado (i.e., the length of time the conditions are imposed, whether they are dictated by statute or vary by offender, how they may be proved, and whether they subject a person to arrest) are likewise extraneous to his status as a sexually violent predator and do not alter our conclusion.

## IV.    Cumulative Prejudice

"Because we have found no error, there is no cumulative prejudice to evaluate." (*People v. Lopez* (2018) 5 Cal.5th 339, 371.) To the extent there are instances where we have assumed error, no prejudice resulted. The same conclusion is appropriate after

considering the cumulative effect of the assumed errors.  (*People v. Valdez* (2012) 55 Cal.4th 82, 181.)

## **DISPOSITION**

The order is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


DE SANTOS, J.


HARRELL, J.